State v. Prendible.

## THE STATE v. PRENDIBLE, Appellant.

### Division Two, November 26, 1901.

1. **Criminal Law**: ASSAULT WITH INTENT TO KILL: INDICTMENT. An indictment for assault with intent to kill, which charged that defendant "with a certain weapon, did shoot off," etc., is not vitiated because of the use of the word "with" before the words "a certain weapon," as that word is necessary to show what weapon was employed in the felonious act. (State v. Turlington, 102 Mo. loc. cit. 651, overruled.)

2. ———: ———: EVIDENCE: SUFFICIENCY: IMPEACHED TESTIMONY. On a prosecution for assault with intent to kill, defendant claimed that the shooting was in self-defense, after complainant had drawn his gun and threatened to shoot him. Complainant denied having made any threats against defendant, but several witnesses testified to hearing him make threats, indicative of an intent to injure defendant, at various times during the day of the alleged assault, and immediately before the shooting. Complainant denied having a gun with him at the time of the shooting. Witnesses testified that he had a gun at that time, and reached for it, and that complainant's only witness as to the manner of the assault took it away immediately after the shooting. Complainant claimed that defendant first began to shoot. Witnesses testified that the two men were talking, when complainant first threatened to shoot, and reached for his gun. Complainant's only other witness as to the manner of the assault was contradicted by witnesses in numerous particulars. *Held*, that, as the testimony of complainant and his witnesses was discredited so as to show that they were guilty of perjury, the court, under Revised Statutes 1899, section 2688, authorizing the granting of a new trial when "the verdict is contrary to the evidence," will set aside a conviction based thereon, for that statute embraces testimony completely impeached.

3. ———: ———: VERDICT: PASSION AND PREJUDICE: APPELLATE PRACTICE. Where the verdict of a jury in a criminal case evidently results, not from calmly weighing the evidence, but from passion or prejudice, the court on appeal will set it aside, and grant a new trial.

4. ———: ———: PROSECUTING ATTORNEY: MISCONDUCT: GROUND FOR REVERSAL. Where the prosecuting attorney, without being repri-

manded by the court, persistently interrogated defendant's witnesses on immaterial and impertinent matters in an insinuating and slurring manner, tending to belittle them, there is ground for reversal of the judgment of conviction, though objections to such interrogations were sustained.

5. ———: ———: IMPEACHING WITNESS: EVIDENCE OF FORMER CRIME. On a prosecution for assault with intent to kill, it was error for the purpose of impeaching defendant as a witness, to admit in evidence his previous conviction of an assault and battery.

6. Evidence: INCOMPETENT: GENERAL OBJECTION. Where evidence is wholly incompetent, a general objection thereto is sufficient.

7. Witness: CROSS-EXAMINATION: TRIAL COURT'S ERROR. Where the prosecuting attorney, in his cross-examination of witnesses, applied to defendant the term "loafer," and the court overruled defendant's objections thereto, the court's action is error.

Appeal from St. Louis City Circuit Court.—*Hon. Selden P. Spencer,* Judge.

REVERSED AND REMANDED.

*William H. Corcoran* and *H. Chouteau Dyer* for appellant.

(1)   The State's attorney was guilty of such misconduct in his remarks to defendant's witnesses on cross-examination and in his willful and malicious characterization of defendant as should warrant this court in reversing this case on that ground alone.    State v. Ulrich, 110 Mo. 350; State v. Young, 99 Mo. 666; State v. Fischer, 124 Mo. 460.    (2) The verdict of the jury is against the evidence and can be explained on no other ground than that it was the result of passion and prejudice.    State v. Rockwood, 26 Mo. 340; State v. Brosius, 39 Mo. 534; State v. Mansfield, 41 Mo. 470; State v. Daubert, 42 Mo. 238; State v. Marshall, 47 Mo. 378; State v. Burgdorf, 53 Mo. 65; State v. Jaeger, 66 Mo. 173; State v. Castor, 93 Mo. 242; State v. Primm, 98 Mo. 368.

State v. Prendible.

*Edward C. Crow,* Attorney-General, for the State; *Perry S. Rader,* Special Counsel.

(1)   Where there is substantial evidence to support the finding of the jury, as in this case, the appellate court will not interfere on the ground that the verdict is against the weight of evidence.   State v. Bryant, 134 Mo. 253.   (2)   The appellate court will not reverse the judgment on the alleged ground that the State's attorney was guilty of misconduct in side remarks in the hearing of the jury and in his argument to the jury, if no evidence of such conduct is preserved in the bill of exceptions.   There is no evidence of such conduct in this case, no affidavits, no objection or exception to such conduct anywhere recited in the bill, and nothing on which to base such allegation except the mere statement itself in the motion for a new trial.   State v. Welsor, 117 Mo. 570; State v. Taylor, 118 Mo. 153.   (3)   This court will not reverse the judgment as being the result of passion or prejudice if there is substantial evidence on which to rest the verdict, but only when it can be explained in no other way than as having resulted from passion, prejudice or partiality.   State v. Cook, 58 Mo. 548; State v. Musick, 71 Mo. 401; State v. Zorn, 71 Mo. 415; State v. Thomas, 78 Mo. 342; State v. Howell, 100 Mo. 659; State v. Primm, 98 Mo. 368; State v. Nelson, 98 Mo. 414; State v. Preston, 77 Mo. 294.   (4)   The indictment is sufficient. State v. Meguire, 113 Mo. 670; State v. Jones, 86 Mo. 624; State v. Elvins, 101 Mo. 244; State v. Wood, 124 Mo. 414; State v. Silk, 145 Mo. 240.   The use of the word "with" before the words, "a certain weapon," do not constitute reversible error.   This exact point was settled in State v. Turlington, 102 Mo. 651.   1 Bish. Crim. Proc., secs. 348, 356, 509 and 510; 1 Chitty Crim. Law, 231; Pierce v. State, 75 Ind. 199; State v. Myers, 85 Tenn. 203; State v. Fitzgerald, 20 Mo. App. 409; State v. Earp, 41 Tex. 418; State v. Thomas, 2 Tex. Ct. App. Rep. 293.   Before an objection, because of false grammar, is

entertained, the court should be satisfied of the tendency of the error to mislead.   1 Bish. Crim. Proc., secs. 354, 357; State v. Grant, 50 Ala. 207; State v. McDaniel, 94 Mo. 301; State v. Burnett, 81 Mo. 119.

SHERWOOD, P. J.—This prosecution was instituted against defendant, John Barry being the prosecuting witness, and the indictment charging that:

"Michael Prendible, on the twenty-seventh day of November in the year of our Lord, one thousand eight hundred and ninety-nine, at the city of St. Louis, aforesaid, with force and arms, in and upon one John Barry, feloniously, willfully, on purpose and of his malice aforethought did make an assault; and the said Michael Prendible, with a certain weapon, to-wit, a pistol loaded with gunpowder and leaden balls, then and there feloniously, willfully, on purpose and of his malice aforethought did shoot off, at, against and upon the said John Barry, then and there given to the said John Barry, in and upon the head and body of him, the said John Barry with a pistol aforesaid one wound with the intent then and there, him, the said John Barry, feloniously, willfully, on purpose and of his malice aforethought to kill," etc., etc.

The trial resulted in a verdict of guilty, and the punishment assessed at imprisonment in the penitentiary for the term of two years.

The testimony of John Barry and of Tierney, witnesses for the State, is in substance the following:

John Barry, the prosecuting witness, testified in substance that on Sunday evening the day prior to the shooting, his brother Simon had been arrested and had been locked up in the police station. The next day, being the twenty-seventh day of November, 1899, Barry laid off from work and set out early in the morning with the expressed intention of securing the release of his brother. He states that he was going along Jefferson avenue about eight o'clock in the morning and on reaching the cor-

ner of Jefferson avenue and Montgomery street, where there is a saloon and grocery store, he went in ostensibly to learn the whereabouts of his brother. After leaving the grocery store, Barry started out to go to Tenth and North Market streets, where he learned his brother was confined; on the way he met a man by the name of Quigley, and spoke with him. Barry reached the police station where his brother was confined, and for some reason undisclosed by the record in this case, he himself was put in confinement, and retained there until about five o'clock of the day of the shooting. During his confinement there he had a conversation with a police officer named John B. Derby, who was for a time acting as turnkey. After his release, which occurred about five o'clock in the afternoon, it seems that Barry went back to the vicinity of Jefferson avenue and Montgomery street, and again fell in with Tierney; and about eight o'clock of that same evening he again went to the same saloon, inquiring for the defendant Prendible, stating as his reason why he wished to see him, that he wanted him to act as a witness for his brother; on the second visit to the saloon he saw witnesses Menke and Schreihagen and talked with them. From that time until the time of the shooting, which occurred about ten o'clock that same evening, Barry's movements are not very well defined, if at all. His testimony, in regard to the shooting itself, is as follows: "I was going north on Jefferson avenue on this evening, between the hour of —— to the best of my recollection it was between eight and nine o'clock. I was coming from my sister's house with a young man by the name of Tierney; we had just come outside and were passing Jefferson avenue and Montgomery street, and I heard Prendible speaking inside, and I went to see him in regard to that younger brother of mine about his arrest, who had been arrested the previous day, and thinking Prendible was a friend of mine, and he was up until that day or evening, I opened the door and called him, I says: 'Mike, can I see you a minute,' and he says: 'Yes,' and came out of the saloon

door, and when he came out the door I walked towards him, and just as he came out the door, he came out shooting. There was two shots fired in rapid succession, and I fell. I picked myself up and I turned around and saw Prendible with a revolver in his hand; he was backing away and away from me and I turned to him and I says: 'Mike, what is the matter with you; what did you shoot me for?' He says: 'Never mind, you dirty s— of a b—, or I will murder you, too,' that is all he said to me; that is all I said to him. My intention was to ask him in regard to my brother's arrest."

The cross-examination shows that Barry had known Prendible for about eleven years and prior to the occasion of the shooting had been on good terms with him. Barry denied that he had made any threats against Prendible advising him that he intended to do him bodily harm. He admitted having met Quigley during the course of his day's wandering, and having had a conversation with him, the import of which, however, was in regard to the whereabouts of his brother; he also admitted having seen officer Derby at the station, and having spoken with him; he also admitted knowing Herman Menke, and admitted having seen him in the saloon on Jefferson avenue prior to the time of the shooting. Barry became somewhat confused in regard to the number of visits he made to the grocery store and saloon on the day of the shooting, but the final outcome of the testimony seems to be that he was there three times, once in the morning about eight o'clock, again in the evening somewhere between seven and eight o'clock, and again about ten o'clock, when the shooting took place. Barry denied having told to any one that Prendible was the cause of his brother's arrest, or had anything to do with it; Barry denied that he carried a revolver or any weapon the day of the shooting. He admitted that he had been convicted of a charge of assault and battery, and that he had been sent to the workhouse for thirty days, some five or six years prior to this time.

Barry's reasons for seeking out Prendible are as follows:

"Q.   But when you came out from your confinement you did not make these inquiries at the police station at all as to whether your brother was to be tried, or what the charge was against him, or anything of that kind?   A.   No, sir.

"Q.   You started out to see whether you could find Prendible, and find out whether he would be a witness for your brother?   A.   Yes, sir.

"Q.   Now, you say that was your sole object and your sole purpose?   A.   Yes, sir.

"Q.   Don't you know that it is not a fact at all that you were looking for Prendible as a witness in his case because your brother was simply charged with carrying concealed weapons and was not to be tried at all?   A.   I wanted to fetch the officer that had beat him up before the police board if there was any chance of doing it."

Barry denied that he made any demonstration of any kind or said anything to Prendible before Prendible shot him. Barry further stated in telling of the occurrence that after he was shot he fell inside of the saloon door, and that three or four minutes after the shooting a man named Brown came out of the saloon with him to where Tierney was and that they two walked with him across Jefferson avenue, where they met an officer, and then proceeded to the doctor's.   Barry also denied having known or spoken to Thomas Ronan the evening of the shooting.

William Tierney testified that he was a paperhanger; that he saw the shooting that occurred on Montgomery and Jefferson avenue on the evening of November 27; that he met Barry on the corner of Jefferson avenue and Benton street and walked as far north as Montgomery street when Barry said, "Wait a minute, Will, I hear my Mike's voice; my brother got arrested last night; Prendible was there; I want to see him a minute." Barry left me standing at the corner of Jefferson avenue which was about twenty-five or thirty feet from the entrance of the saloon, and he, Barry, walked to the saloon door and called

Prendible out. When Prendible came out Barry spoke a few words to him in a low tone, not understood by witness, and then Prendible fired two shots in rapid succession; and on the second shot Barry fell and that he, Tierney, went up to Barry to pick him up when Prendible said to him, "I have a notion to give it to you, too."

On cross-examination Tierney testified that after the two shots were fired he started immediately towards Barry intending to pick him up, but that when Prendible said that he had a notion to give it to him, too, he turned around and ran away, and about ten minutes aftewards he went back by the saloon and in company with Brown took Barry across the street, where they fell in with officer Quinn, and together they went with Barry to the doctor's, and afterwards to the hospital.

This was all of the testimony in chief on part of the State, except that Dr. Brokaw testified that the bullet causing the wound had struck the muscles which surround the shoulder blade and about one and three-quarters inches from the spine, and had then ranged or been deflected by the muscles forward, and into the chest.

On the part of the defense, Griffin Henderson testified that he was a hodcarrier and lived in the neighborhood of the shooting, and on that same evening was going home about ten o'clock and was passing along by the entrance to the saloon when he heard Prendible and Barry outside the saloon on the sidewalk arguing; that he heard Barry say to Prendible that he was the cause of his brother's getting arrested by Pete Walsh; that Prendible denied knowing anything about it, stating further that he, Prendible, was back in the saloon and did not have anything to do with the quarrel between the officer and his brother; that he heard Barry say to Prendible, "Well, if I thought you did I would kill you," and Barry backed off from Prendible and said, "I have got a notion to shoot you," and swung around and reached down for his gun; Prendible then pulled out a gun and shot him; that he then saw little Will

Tierney run down from the corner and take a gun away from Barry; that Tierney ran over to Jefferson avenue and came back about five minutes afterwards and helped Barry out of the saloon; he testified positively that he saw Tierney reach down into Barry's pocket and take out his gun.

On cross-examination witness was asked to explain how it was possible for Barry to have been shot in the back if he was standing talking to Prendible. His reply was to the effect that after Barry told Prendible he had a notion to kill him, he aimed to swing around, presumably to draw his pistol, and that when he swung around Prendible shot him. Witness testified further that the shooting occurred about ten o'clock.

Henry Sullivan testified that he was a member of the police force and had been an officer for about eleven years, having been attached to the Fifth district the greater part of that time. He further testified that he had known the defendant for ten or eleven years, having lived in the same neighborhood with him and was well acquainted with his general reputation for peace and quiet; that he knew that Prendible was quiet and peaceable, and a law-abiding citizen, and that during the years of his acquaintance he had never known or heard of anything derogatory to defendant's character.

The cross-examination simply affirmed the direct examination.

John Murphy testified that he was a police officer and had been on the force for about four years; that at that time he was stationed in the Fourth district. Witness stated that he knew the defendant Prendible and that his reputation for peace and quiet in the community in which he lived among those who knew him was very good. Witness further stated that he had known Barry all his life and Barry's reputation in the community in which he lived for peace and quiet was very bad.

On cross-examination he testified that there had been some trouble between some of the members of his family and the

Vol 165 mo—22

members of Barry's family, but that he, himself, had never been connected with it in any way.

Patrick Burke testified that he was a police officer and had been on the force about five years, having patroled the Fourth district. Witness stated that he knew Barry and had known him for five years previous to this time and that Barry's reputation for peace and quiet was very bad. Witness also stated that he knew Prendible, having known him for the last twenty years and that his reputation for peace and quiet during the time he had known him was very good. That he never knew of Prendible's being in trouble before this time.

On cross-examination witness testified that he had never arrested Barry, but that sometime before he had had occasion to arrest him for canning beer, but Barry, after calling him vile names, managed to get into his own house and out of his way. Witness was further asked the following questions:

"Q. What does Prendible do? A. Prendible has been a peddler.

"Q. All the time? A. Very nearly all the time.

"Q. What do you mean by that answer, by 'very nearly all the time?' What do you know of Prendible doing or what have you ever seen him do? A. I have seen him run a peddling wagon.

"Q. When? A. Well, I have seen him lately and years ago.

"Q. How long since you saw him engaged in anything? A. I saw him engaged in peddling a month ago.

"Q. How long before that? A. Three years.

"Q. Now then, from the three years before that up to the time you saw him on the wagon a month ago, did you ever see him do anything? A. No, sir.

The witness was then asked as to the general reputation of John Barry, for peace and quiet, when he gave answer that it was very bad. Then witness was asked if he, witness, had ever arrested Barry, and gave a negative answer. Then witness

was asked if he, witness, was not a good police officer; this was objected to on the ground of its being immaterial why witness never arrested Barry. This objection was overruled, and defendant excepted. After some other questions, this one was asked witness: "Did you ever see him do anything wrong?" The objection that this was immaterial, was overruled and defendant again excepted. Then this question was asked: "Don't you know now, officer that the fact is that this boy here is a hard-working boy and that Prendible is a *loafer* up around the corners there?" "A. No, sir, he is not." To this question defendant objected to the use of that term against defendant, by an officer of the State. This objection was overruled and defendant excepted. Then after a number of questions casting reflections in a greater or lesser degree on defendant, the witness was asked these questions:

"Q. What saloon does he hang around there? A. I don't know that.

"Objected to as casting an unnecessary slur upon the defendant. Objection sustained.

"Q. Well, does he hang out at any saloon? A. I don't know that.

"Objected to; objection sustained.

"Q. Well, how intimately do you know him? A. I know him to see him.

"Q. Just when you see him? A. No, sir. I knew him fifteen years ago. He lived in the same neighborhood that I did, you might say born and raised together.

"Q. Do you know him to have gone to the workhouse? A. No, sir, I don't know that."

Peter Walsh testified that he was a police officer in the Fifth district; that he knew John Barry, the prosecuting witness. Witness was then asked whether he had occasion to arrest Barry's brother on the twenty-sixth of November. This question was objected to on the ground that whether Prendible had anything to do with the arrest of Barry's brother was im-

material, and on further ground that the reasons the prosecuting witness may have had in making threats against Prendible were not material.    Objection was sustained, to which ruling of the court counsel for defendant then and there duly excepted.

Nicholas Brown testified that on the evening of the twenty-seventh day of November when the shooting occurred he was in the saloon on the corner of Jefferson avenue and Montgomery street, sitting at a table playing cards; that Prendible was standing or sitting by the table looking on but not taking any part in the game; that about half past ten o'clock Barry came to the door of the saloon and called Prendible out, but after Prendible went out the door was shut and in about five minutes he heard two shots; that after the shooting Barry came into the saloon and said:    "I am shot, go and get a doctor;" that witness said to him, "Jack, I will get a doctor, come on with me," and with that he took Barry across the street and turned him over to the officer.    Witness was asked whether he had seen anything of Tierney during that time and replied that some time after Barry was shot he saw Tierney and Barry's brother coming south on Elliott street from the direction of Barry's house; that that was the first time he saw Tierney; that he had gotten about seventy-five feet from the saloon, with Barry when Tierney appeared.

On cross-examination witness testified that he was a teamster by trade, but that he had not done much work during the last four years; that Prendible had been out of the saloon between five and ten minutes before the shooting occurred.    Witness further testified that he had never heard anything about Prendible having been a convict in the workhouse; that after Barry was shot, he took him across the street and then came back and closed up the store and then returned and walked down to the doctor's with Barry; that he did not see Tierney until after he and the saloonman closed the store and Barry was on the way to the doctor.

James Quigley testified that on the morning of the day on

which the shooting.occurred he met Barry, whom he had known previously, on Jefferson avenue and Montgomery, about half past eight in the morning; that Barry asked him if he knew where Prendible was; that he replied he did not, and Barry said, "if you see him tell him for me I am going to kick the s— out of him as soon as I see him." Witness further testified that he went down town and about noon he met Prendible's brother on Broadway and Lucas avenue and communicated to him what Barry had told him about defendant.

On cross-exmination Mr. Quigley testified that he was a boilermaker by trade; that at the time of the shooting he was not working, but had worked just previous to that time; that he went down town with the intention of looking for a job and had gone particularly to see a man named Larrissey, who hauled for Meyer-Bannermann, and he met Prendible's brother on Broadway and Lucas avenue and delivered the message from Barry to him for defendant.

The cross-examination was mainly concerning where, when and at what witness worked.

William Prendible testified that he is a brother of the defendant; that he was a married man and was employed as assistant cashier of the Postal Telegraph and Cable Company at Fourth and Olive streets; that his brother, the defendant, lived on the corner of Parnell and Warren streets with his sister. Witness further testified that he met James Quigley on the twenty-seventh day of November, on Broadway and Lucas avenue, about half past twelve, and that Quigley said to him that he had come down to see if he could find defendant, and upon being asked why, Quigley replied that he had met Barry in the morning on Jefferson avenue and Montgomery, and Barry told him that if he saw the defendant to tell him that if he, Barry, happened to run across him, he intended to do him bodily harm. Witness repeated Barry's words. Witness further testified that he went home to supper and after supper he started to go to his brother's house to find out if pos-

sible what was the trouble between him and Barry; that on the way to his brother's house he saw Barry in company with Tierney on Jefferson avenue on the north side of the street, they having just come out of the saloon at that time; that Barry was full and was talking loud, and that he overheard him say to Tierney, "I am going to get that s— of a b—, or I won't go to sleep to-night;" that he did not speak to Barry, but proceeded along Jefferson avenue until he reached the saloon on the corner of Montgomery and Jefferson avenue; that he saw Menke and Mr. Haneklow and two negro men in the saloon; that his brother was not in the saloon at that time, which was about eight o'clock; that after leaving the saloon he went up to his sister's house, which was two blocks from the saloon, and found his brother there lying across the bed asleep with his clothes on; that he remained at the house about an hour, told his brother about the threats made against him, and then he and his brother went down to the saloon together and had a glass of beer and he told his brother to take care of himself; that he then left the saloon and went on home; that about half past ten o'clock he went down to the police station with the defendant, as defendant desired to give himself into the custody of the police.

On cross-examination witness testified that he did not get his brother out of bed, but that his brother got up when he heard him and his sister talking about Barry; that his brother did not go out immediately, but that they remained there talking for an hour or so, and that he told his brother that he had better not go out. Witness further stated he did not see defendant get a pistol anywhere. Witness further stated that several years before this occurrence he had had trouble with Barry; that he knew that defendant had been confined in the workhouse for a period of less than a month, some six or seven years prior to this time; that he left his brother in the saloon when he went home. That he told his brother the threats that Barry made to Quigley, and the threat he overheard Barry make.

On re-direct examination witness testified that the only difficulty he had with Barry occurred in a baseball game some seven or eight years prior to this time.    In reply to a question put by the prosecuting attorney in regard to what the defendant told. this witness when he communicated Barry's threats, witness replied as follows:    "Why, he says to me I never did anything to him," he says, "I don't see why I should stay in the house," he says; he says, "I don't see why I should stay in the house and be scared of a man when I did not do anything to him;" he says, "I got to attend to my horses, I have got to go out," he says; "that is all he says to me."

Thomas Roman:    Witness testified that he was thirteen years old; that he attended school; that he knew the defendant and knew where he lived; that on the evening of the twenty-seventh of November, about a quarter past seven o'clock, he met Barry on the corner near Prendible's house, and Barry asked him if he knew where Prendible lived; that he told Barry he did, whereupon Barry told him that he would give him a nickel or a dime if he would go and tell Prendible that there was a fellow who wanted to see him.    Witness further stated that in compliance with Barry's request he went to Prendible's house and inquired for him, but was told by Prendible's sister that Prendible was asleep, and that he could not go down.    Then he went back and told Barry what Prendible's sister had said.

On cross-examination witness stated that he had known Barry for two years; that Barry was by himself when he addressed him, and that Barry did not pay him for doing the errand.    Witness repeated that it was about seven or half past seven when he met Barry, and further stated that he had not talked with any one save his mother in regard to what he testified to.

John Derby, a witness, testified that he was a police officer, and that on the twenty-seventh day of November he was on duty at the Fifth district police station; that he saw Barry, the prosecuting witness, there at the police station about twelve

o'clock of that day; that Barry was locked up in a cell for rea-
sons that he did not know; that he entered into conversation
with Barry, and in response to the question whether Barry said
anything about Prendible, witness replied: "Well, Barry was
locked up there. I asked him if he couldn't get somebody to
bail him out. He said he could not, but that when he got out
he would be right back; he'd go out and get Prendible, the
s— of a b—, and fix him and give him good reason for to lock
him up."

On cross-examination witness stated that he was acting as
turnkey that day at the station; that he had known Prendible
for seven years, but had never heard of his being confined in
the workhouse. That there were other conversations between
Barry and him besides that concerning Prendible; that Barry
also made threats concerning officer Walsh.

Adolph Schreihagen, witness, testified that he was a gro-
cery clerk, and on November 27, 1899, was working for Hane-
klow on the corner of Jefferson avenue and Montgomery street,
that he was not there at the time the shooting occurred, having
left the store about seven o'clock that same evening. Witness
stated that Barry came into the saloon about half past eight on
the morning of the twenty-seventh of November and asked if
Jack Reagan was there. Witness replied that Reagan was not
there and inquired if Barry had a job for him, to which Barry
replied that he did have a job for him; that he was going to
"punch the s— out of him and Prendible" when he saw them.
Barry further asked the witness if Prendible was around there,
and on being told that he was not, replied that it would not
be good for him when he saw him. Barry further inquired of
witness where Prendible's stable was located, and witness gave
him the information, and stated that Prendible's stable was lo-
cated about a block and a half from the saloon.

On cross-examination witness said that he did not know
that Barry and Prendible were supposed to be friends; that
Barry said he was looking for Reagan because he had caused

the arrest of his brother the night before; that he had never seen Barry before that time.

Herman Menke, witness, testified that he saw Barry on the day of the shooting about half past seven or eight o'clock in the saloon on the corner of Jefferson avenue and Montgomery street; that Barry came into the saloon and after abusing Menke in very obscene language, said, "Where's that red faced s— of a b— Prendible at?" to which witness replied that he did not know. Barry then asked witness where Prendible's stable was located, and witness gave him the information. As Barry was leaving the saloon he said, according to this witness, "Well, you tell the s— of a b— he better have one that will shoot six or eight."

On cross-examination witness stated that at the time he did not know exactly where Prendible's stable was located, but that he believed it was two blocks or so from the saloon. Witness further stated that he had no feeling against Barry whatever, that Barry had never done anything to him save call him names that evening.

Arthur Dowling, witness, testified that he knew Barry and that he saw him on the evening of the shooting about half past seven o'clock on Jefferson avenue and Benton street; that Barry asked him where Prendible's stable was located, and having answered this query and after telling Barry that he couldn't find Prendible there, to which query witness replied by asking if he, Barry, wanted to see Prendible; that Barry then asked where Prendible lived, and was told, whereupon he turned to Tierney, who was with him at the time, and said, "Let's go up to the house and we'll get the s— of a b— as he is coming down and we'll give it to him good."

On cross-examination witness denied that he had ever been indicted or tried for highway robbery, but stated that he had at one time been in the sheriff's office waiting his turn to testify as a witness in a highway robbery case.

Michael Prendible, witness, testified that he was the de-

fendant in the case on trial; that he had lived in St. Louis about twenty-eight years and followed the business of a huckster; that he lived at Parnell and Warren streets with his sister; that he knew Barry and had known him for some time, as long as he had been living up in that neighborhood, which was about ten years; that he knew Barry's brother, Simon Barry, and that he had nothing whatever to do with his arrest the evening before the shooting; that the first time he saw Barry on the day of the shooting was about ten o'clock that evening; when Barry came to the saloon door on Jefferson avenue and Montgomery street and called him out. When asked to state what occurred then witness replied: "Well, I was sitting in there and Barry opened the door. When he opened the door he called me outside, said he wanted to see me. I said 'All right, John,' and I walked out. When I got outside the door he said, 'You s— of a b—, what did you have my brother arrested for?' When he said that he stepped back and he goes down in his pocket, and when he went down in his pocket I pulled out, and he got his gun out too, but it wouldn't go off; he shot it and it wouldn't go off, and I fired two shots."

"Q. Well, now, when that occurred, what became of Tierney? A. Tierney ran around the corner when he heard the first shot. He didn't stand at all. He run around the corner, with Tierney following, and when I got up the street I seen Tierney coming back and some other fellow coming back, but I didn't know who it was.

"Q. Did you say anything to Tierney at all? A. No, sir; never said a word to Tierney."

Witness further testified that after the shooting he went to his brother's house, and then went down to the police station and gave himself up.

On cross-examination witness testified that he had had his pistol in his pocket all day; that in his business as a huckster he was obliged to carry considerable money, thirty or forty dollars,

and that on those occasions he carried a pistol; that on the day of the shooting he had been to the market early and returned home about half past three o'clock and lay down to take a sleep, as he was tired; that he slept until his brother came to the house. Witness stated that he had served a term of about fifteen days in the workhouse some seven or eight years prior to this time, for disturbing the peace; that he had never been convicted for any crime. He stated that Barry drew a pistol and was snapping it at him, but that it would not go off; that Barry pulled it out of his own pocket and pointed it right at him, and that after he shot Barry, Barry put the pistol back into his pocket and staggered into the saloon; that he fired two shots, and that he believed that the second shot hit Barry; that when Barry put the gun in his pocket and staggered toward the saloon door, he, Prendible, saw some one coming towards Barry.

William Tierney: In rebuttal, witness testified that he went to the hospital with Barry; that an officer searched Barry there, but that nothing was found on him.

John Stanton, in rebuttal, testified that he had known Barry about all his life; that he knew his reputation for peace and quiet in the community in which he lived, and that it was both good and bad. On being asked to explain what he meant by saying that it was both good and bad, witness replied: "Well, I mean to say that some people talks bad of him, don't give him a character as being peaceable at some times, but I can't say anything about that."

Robert Asmus testified in rebuttal, that he had known Barry for about eighteen years, and that his reputation for peace and quiet was good, " that it was all right."

On cross-examination witness testified that he knew that Barry had been arrested about five years before that time, and had been convicted, and had served thirty days in the workhouse.

Theodore Freise testified in rebuttal, that Barry's reputation for peace and quiet in his neighborhood was good.

On cross-examination witness stated that he had heard that Barry had been arrested some five years prior to this time.

First:

As to the indictment. It is in usual form. Nor does the word "with" before the words "a certain weapon" vitiate the indictment. Without that little word the indictment would have been fatally defective, because of lacking a statement showing what was the lethal weapon employed in the felonious act. This precise point was thus stated in the minority opinion in State v. Rector, 126 Mo. loc. cit. 340, in regard to the omission of the same word "with" in an indictment for murder. This position in regard to the omission of the same word, afterwards was recognized as correct in State v. Furgerson, 152 Mo. loc cit. 97, and Ibid., 162 Mo. loc. cit. 675, and in the latter case, the remarks made in Rector's case quoted with approval.

In State v. Turlington, 102 Mo. loc. cit. 651, however, on an indictment for murder, it was ruled that the insertion of the word "with" before the words "a certain pistol," was "needlessly and improperly inserted." But that case, on the point in question, is not law and will not further be followed.

We next proceed to examine and compare the testimony of some of the different witnesses both pro and con the prosecution; and the propriety of this will be made apparent later on.

Barry, the prosecuting witness, was contradicted in many material and important features and particulars of his testimony. In the first place, he denied having made any threats whatever against Michael Prendible on the day of the shooting. In this he is directly and explicitly contradicted by the clerk in the grocery store and saloon, on corner of Jefferson avenue and Montgomery street, Schriehagen, whom Barry interviewed early in the morning on his way to find his brother. He swore that Barry asked him concerning Prendible, and informed him that he intended to assault him on sight, using language we do not care to repeat. Quigley, whom Barry met shortly after-

wards, testified that Barry also asked him concerning the whereabouts of Prendible, and further told him to tell Prendible that he was looking for him with evil intent, again using obscene language. The turnkey, officer Derby, testified that about noon on that same day he was conversing with Barry, having known him previously, and that Barry told him that it would be no use of his getting out on bail, because if he did he would hunt up Prendible and fix him, so that they (the authorities, presumably) would have some good reason to lock him, Barry, up. Herman Menke testified that Barry went into the saloon about seven or eight o'clock, where he, Menke, was, and after cursing and abusing him in the most vile and indecent language, began to inquire for Prendible and to curse and threaten him, in a way calculated to put the most mild and inoffensive man on his guard. Arthur Dowling testified that Barry met him near the saloon about 7:30 o'clock the same evening of the shooting and asked first, where Prendible's stable was, and being told, and that Prendible was not there, at the stable, Barry asked where Prendible lived; that he told him and Barry then turned to his companion, Tierney, and said to Tierney, "Let's go up to the house and we'll get the s— of a b— as he's coming down and we'll give it to him good." And then Barry went away.

William Prendible, the defendant's brother, said he saw Barry and Tierney on Jefferson avenue about eight o'clock on the evening of the shooting; that Barry "was full" and was talking loud, and that he overheard Barry say to Tierney, "I am going to get that s— of a b—," he says, "that red faced s— of a b—, or I won't go to sleep to-night." Six witnesses, Schreihagen, Quigley, Derby, Menke, Dowling and William Prendible.

He is also contradicted by Thomas Roman, a little boy thirteen years old, who testified that Barry offered him a nickel or a dime about half past seven the same evening if he would go to Prendible's house and tell him a fellow wanted to see

him; this was right at the corner next to Prendible's house; that he went into the house, but was told by Prendible's sister that Prendible was asleep and could not go down, and Barry, foiled in his effort to get defendant to come down, then went away.

Barry, however, denied that he ever knew or spoke with Roman, but he admitted meeting the other witnesses during the day, with the exception of Prendible's brother, who, however, did not state that he met Barry face to face that day.

Roman, on the contrary, is corroborated by Dowling, whose testimony already stated, shows that near the same time in the evening that Roman speaks of, Barry (Tierney being with him) was near the saloon, and inquiring where defendant Prendible lived, and making threats about him. As shown by other testimony, defendant only lived two blocks from the saloon.

Barry also denied that had a "gun" when he called defendant out of the saloon. On this point, Tierney is silent; he does not testify. Barry is contradicted about this denial by Griffin Henderson, who passed along on the sidewalk near the entrance to the saloon, and heard Prendible and Barry "outside the saloon on the sidewalk arguing;" that they were talking about whether Prendible had caused Barry's brother's arrest, which Prendible denied, when he heard Barry say to Prendible, "Well, if I thought you did, I would kill you," and Barry backed off from Prendible and said, "I have a good notion to shoot you," and swung around and reached down for his gun; Prendible then pulled out a gun and shot him; that he then saw little Will Tierney run down from the corner and take a gun away from Barry; that Tierney ran over to Jefferson avenue and came back about five minutes afterwards and helped Barry out of the saloon; he testified positively that he saw Tierney reach down into Barry's pocket and take out his gun.

Defendant also testified positively that Barry drew a

"gun" on him and snapped it at him, before he fired in self-defense.

Barry is also contradicted in his statement that when defendant came out of the saloon door *"he came out shooting."* In this he is contradicted by Griffin Henderson, who states, as above shown, that Barry and Prendible were "on the sidewalk, arguing," before the shooting began, and Barry is also contradicted on this point by Brown, who was sitting in the saloon when defendant was called out of the saloon by Barry, and he says that it was about five minutes before he heard two shots. Barry is even contradicted on the point that defendant "come out shooting" by his own *fidus Achates,* William Tierney, who testified that after defendant came out of the saloon, Barry was talking to him in a low tone of voice, the words of which Tierney could not understand.

But Tierney was not altogether outstripped by Barry in mode, manner, measure and methods of testifying, because Tierney testified that *he had not been with Barry at all that day;* that he hadn't seen him until that evening, *about fifteen or twenty minutes before the shooting occurred.* Yet, in this he is contradicted by Dowling, who testifies that on the evening of the rencounter, about 7:30 o'clock, he saw Barry and Tierney together, on Jefferson avenue and Benton, when Barry made some inquiries of witness, about Prendible, as before stated, and then turned to Tierney and made the threatening remark heretofore quoted; and they both then went off together.

Tierney is also contradicted on this point by Wm. Prendible, who saw both Barry and Tierney together about 8 o'clock that evening, when Barry was making loud-mouthed and obscene threats about defendant.

Tierney also testified that he never took away a "gun" out of Barry's pocket. On this point he is also contradicted by Griffin Henderson, who testified that Tierney did that very thing, and then ran away over to Jefferson avenue and was gone about five minutes; and that it was *Brown,* and not *Tierney,*

that assisted Barry out of the saloon whither he had staggered. Brown corroborates this story of Griffin Henderson, about Tierney not going to the saloon and assisting him to take Barry from the saloon to the doctor's because Brown testifies:

"Q.   Now, after you heard the shooting, what did you do, Mr. Brown?   A.   After I heard the shooting, I stood inside the saloon and Mr. Barry came in and said, 'I am shot,' and the storekeeper wanted to put him out, and he didn't go out that time, and he says, 'Go and get a doctor.'   I says to him, 'Jack, I'll get a doctor; come on with me,' and I carried him across the street and turned him over to the officer.

"Q.   Where was the officer?   A.   He was on the west side of Jefferson avenue.

"Q.   Now, during all that time, Mr. Brown, did you see anything of Tierney?   A.   No, sir, I did not, not until after the saloonman cleaned up; me and Haneklow, the saloonman, we walked down to the doctor's and we seen Will Tierney and Si coming south on Elliott avenue, coming from the direction of Barry's house.

"Q.   Was that the first you had seen of Tierney?   A. Yes, sir; the first time I had seen Tierney.

"Q.   How far had you gotten from the saloon with Barry before you saw Tierney?   A.   Well, I guess probably between fifty and seventy-five feet.

"Q.   They were coming from the opposite direction? A.   No, I was going towards west with him when I turned him over to the officer."

But Tierney, in effect and substance, testified that he and Brown went together from the saloon door until officer Quinn was met, which was not true, if what Henderson and Brown testified to, be the truth.   So that this furnishes another contradiction of Tierney's testimony.

Looking at the testimony of Barry and Tierney from every point of view, it seems quite clear that they, and each of them, were guilty of perjury when testifying in this cause;

direct, brazen-faced, audacious perjury. But it seems that perjury need not consist of false testimony directly bearing on the issue; it will suffice, it will be deemed material, if it tend, even circumstantially, to the proof of the issue. [2 Archb. (8 Ed.), 1727.]

And, at common law, it was ground for a new trial, if the witness or witnesses who testified in behalf of the prevailing party were "shown to be evidently foresworn." [1 Chitt. Crim. Law (5 Am. Ed.), 656.]

And under statute (sec. 2688, R. S. 1899), it is one of the grounds for a new trial that the "verdict is contrary to the evidence," and this was one of the grounds alleged in the motion for a new trial. And this statutory ground is clearly comprehensive enough to embrace within its scope, testimony of the character above noted; testimony impeached in all its more prominent features and bearings, for testimony completely impeached is no testimony at all, and no conviction based on such testimony should be permitted to stand when called in question in an appellate court. [People v. Lyons, 51 Mich. 215, 16 N. W. 380; see also, State v. Huff, 161 Mo. loc. cit. 487, and cas. cit.]

But in addition to what is above said, this court, in numerous instances, has decided that where a verdict is evidently prompted by prejudice, passion or partiality and is not the result of the calmer weighing of the facts in evidence which should always characterize the deliberations of a jury, it will interfere. [State v. Packwood, 26 Mo. 340; State v. Brosius, 39 Mo. 534; State v. Mansfield, 41 Mo. 470; State v. Daubert, 42 Mo. 238; State v. Marshall, 47 Mo. 378; State v. Burgdorf, 53 Mo. 65; State v. Jaeger, 66 Mo. 173; State v. Castor, 93 Mo. 242; State v. Primm, 98 Mo. 368.]

But apart from the above observations, there are two other grounds mentioned in the motion for a new trial which seem to merit consideration; they are as follows:

"Fourth: Because the court erred in permitting the circuit attorney, representing the State, to persistently interrogate witnesses as to matters impertinent, immaterial and grossly incompetent, to the great prejudice of the defendant and in direct violation of law, over the timely objection of defendant.

"Fifth: Because the circuit attorney was guilty of gross misconduct in the examination and cross-examination of witnesses, in side remarks in the hearing of the jury, to the prejudice of the defendant."

Some instances of the conduct complained of on the part of prosecuting officer will now be given:

In examining officer Burke the prosecuting attorney said: "Don't you know now, officer, that the fact is that this boy here is a hard-working boy, and that Prendible is a loafer up around the corner there?" The defendant's counsel objected then and there to the use of such language on the part of the State's officer, but the court, instead of reprimanding the prosecuting attorney, as it should have done, overruled the objection, to which exception was saved, which ruling lent encouragement to the prosecuting attorney to continue such tactics. And he did continue then, for further on in the examination of the same witness the prosecuting attorney, referring to the defendant, said: "What saloon does he hang out of around there?" This language was objected to on the ground that it was a slur upon defendant, and the objection was sustained, and the very next question was: "Well, does he hang out at any saloon?" The objection to that on the same ground was sustained, but the mere sustaining of the objection after the words were spoken, and no action taken by the court to prevent the further occurrence of such misconduct, did not in any way destroy their weight with the jury.

This same course was pursued, page after page, by the prosecuting officer. Thus, a considerable portion of the transcript is taken up with inquiries as to whether defendant had

not been sent to the workhouse; whether he had not been sent more than once, etc., without any intimation or suggestion as to the nature of the offense for which he was sent.    This it seems, was carefully avoided.    Now, it is well settled in this State that while the conviction of an infamous 'crime will serve to impeach a witness, yet, save for petit larceny, conviction of anything less than a felony does not impeach a witness.  [State v. Dyer, 139 Mo. loc. cit. 212.]

Thus, in State v. Smith, 125 Mo. 2, it was ruled that evidence of conviction of an assault and battery was inadmissible for purpose of impeachment. And the like ruling was made in State v. Donnelly, 130 Mo. 642, in reference to a conviction of gambling.  So that all such questions were entirely improper, wholly irrelevant, and tended to mislead the jury (not being rebuked) into the belief that they tended to discredit or impeach defendant's testimony, which was not true and, therefore, all the more damaging because not true.

It finally turned out, however, that defendant was only sent for a few days to the workhouse, and that five or six years before, for assault and battery.    Meanwhile, however, the damage *intended* to be done by this persistent series of irrelevant questions was done.    And such questions as these about the workhouse were frequently pressed on witnesses who had spoken to the uniform good character of defendant.

But a far different course was pursued by the prosecuting officer when it was testified by any witness for defendant, as was usually the case, that Barry's reputation for peace and quiet, was "very bad;" then the prosecutor commenced to belittle the witness; cast slurs and insinuations at him, evidently in order to break his credit as a witness down.    Thus, officer Burke, testifying about Barry's reputation for peace and quiet, answered:  "His reputation is very bad."    Then the prosecutor was allowed to argue with the witness as to why, if Barry *"was such a bad man,* witness had not arrested him."    When Burke very sensibly replied:  "Mr. Howe, I was asked the

general reputation of this man among the neighbors up there."
Then this occurred:

"Q. Well, I know. I am asking you a· question. Now,
you, please, answer my question. I say you are a good officer,
a good police officer?

"Objected to as immaterial as to why witness never ar-
rested Barry. Objection overruled. To which ruling de-
fendant then and there duly excepted.

"Q. You are a good police officer?

"Objected to as calling for witness' opinion in regard to
himself, which he is not required to give in any court of justice.
Objection overruled. To which ruling defendant then and
there excepted.

"A. You ask me if I am a good police officer?

"Q. Yes? A. Well, Mr. Howe, I'll have to leave that
to the general public. I can't answer that question.

"Q. And yet you were in the district where this beat was·
for five years, know him to have a very bad reputation and
never arrested him for anything?" . . . .

"Q. And during all that time, while he has had such a
bad reputation, you never arrested him for anything at all?
A. No, sir, I did not.

"Q. Did you ever see him do anything wrong?

"Objected to as immaterial. Objection overruled. To
which ruling defendant then and there duly excepted.

"A. I did. I run after him one night from the corner of
University street and Elliott avenue. He and a gang of about
ten fellows were canning beer there on the corner.

"Q. You tried to arrest him for canning beer? A. I
come down after him and he was the last one that went, and he
just got about twenty-five feet away from me and kept calling
me "c— s—" and "son of bitch" until he ·got to the gate, and
as far as I'd go after him he'd go farther until I followed him
to the gate, and then he went into the house, kept backing up,
kept the same distance away. But those complaints that I have

had out there while I was walking there, people come to me and would complain about him assaulting them, but it was not enough of an assault for to make an arrest, and I would advise them to see the prosecuting attorney in the police court and get a police summons against him.

"Q.   And you didn't arrest him that time for canning beer either?   A.   No, sir, he got in the house."

The first of these questions was clearly inadmissible. Whether Burke was a good police officer or not, had nothing in the world to do with the general reputation of Barry for peace and quiet, and consequently the objection should have prevailed.   And the evidence being wholly incompetent, a general objection to it was sufficient.   [State v. Meyers, 99 Mo. 107, and many subsequent cases.]

And the same language is applicable to the question: "Did you ever see him do anything wrong?"   How the trial court expected evidence of specific instances to either help or hurt a general reputation is certainly very remarkable.   The only conceivable object the prosecutor could have had by asking this sort of question, was to cover up the fact that *Barry had a very bad reputation*.   Either this must be true, or else the alternative is true, that those questions sprang from a not very familar acquaintance with the rudimentary principles of evidence.

Further along, the prosecutor in the endeavor to worry and belittle the same witness, and still speaking about Barry, asked:

"Q.   Did you ever drive a cart in the street with him? A.   Yes, sir, I did.

"Q.   How long since you drove a cart?   Did you get off the cart on the police force?   A.   Well, I don't think that is a question I should answer.

"The Court:   O, answer the question, officer.

"Mr. Bishop:   I object to it as insolent and immaterial.

"The Court:   I don't like the form of the question.   If

you want to know whether he had been driving a team before he went on the police force, ask him the question.

"Mr. Howe: Well, I meant to ask it that way, your Honor. I did not mean any disrespect to the gentleman, because I know some very honorable young boys who drive carts."

Now it is extremely difficult for the ordinary legal mind to see what Burke's former employment as a cart-driver had to do with Barry's general reputation for peace and quiet, or whether Burke "got off the cart on the police force," or not, what *that* had to do with that reputation, is immeasurably beyond the grasp of the finite mind. These questions seem evidently intended, and only intended, to multiply the issues before the jury; immaterial issues at that, and so confuse their minds as to obscure and hide the real issue in the case, and the baldness and insufficiency of the State's evidence to support that issue.

Winding up with officer Burke, the prosecutor asked the question first above noted as having been asked the same officer, and being objected to, that objection overruled.

Other police officers who testified as to the good reputation of defendant, were subjected to a similar ordeal that Burke was. Nor did the witnesses who testified in behalf of defendant fare any better or escape the belittling and contemptibly annoying course pursued by the prosecutor as above indicated. Thus Brown, was asked from whence he derived his income. Defendant's counsel objected to this as immaterial, but this objection missed fire, as most of defendant's others had done, and he excepted. Again the question comes up: What did Brown's source of income have to do with his standing and character as a witness?

The most if not all of the exceptions taken by defendant have been noted as above, but no exceptions appear to have been taken as to questions about defendant having been confined in the workhouse, although the cause of such confinement was not stated. Indeed, defendant's counsel, overruled so

often, as he was about his objections, seems to have been finally discouraged, "grown weary in well doing," and ceased to object when he should have continued to do so.

Defendant was subjected to the same persistent, petty, annoying and belittling series of questions, that had nothing at all to do with the issue joined between State and defendant, that other witnesses had been subjected to. Thus, he was asked as to whether he had ever been sent to the workhouse, without asking what for. Then fictitious cases were supposed and he was questioned as to them. For instance, he was questioned as to whether a warrant had ever been issued against him for hitting a man with a bottle or tumbler, and upon a denial being interposed, he was asked if he had ever been arrested for beating a girl, and a denial was interposed to this question also. How these isolated facts, supposing them to be facts, and these particular instances, could affect defendant's general reputation for peace and quiet, or how they could shed any light on the then pending controversy, we are not informed.

And right here it is proper to state that during quite an extensive practice at the bar in criminal causes, and during a considerable experience in assisting in the administration of the law in such cases, on this bench, I have never met with such reprehensible conduct on the part of a prosecuting officer, toward a defendant and toward his witnesses, as this record exhibits.

In regard to the error committed by the trial court in overruling defendant's objections about applying to him the term *"loafer,"* this is such an error as was condemned by this court in a case similar to this one, where, although the verdict could not be attacked on the ground of lack of evidence, yet this court reversed the judgment on the ground of improper language used about defendant by the prosecuting attorney, BURGESS, J., in delivering the opinion of the court, saying: "The language used was mere personal abuse, having nothing whatever to do with the case or the facts and circumstances in proof.

It should not have been tolerated and was only calculated to inflame the passions of the jury against the defendant, who was entitled to a fair and impartial trial without having heaped upon his head personal abuse in the presence of the court and jury. And because of this fact the judgment is reversed and remanded." [State v. Fischer, 124 Mo. 460.]

The judgment should also be reversed for the other errors also above noted, where exceptions were saved. Judgment reversed and cause remanded. All concur.