# THE STATE v. VINCENT SARTINO, Appellant.

**Division Two, February 2, 1909.**

1. **INDICTMENT: Unknown Deceased.** An indictment charging defendant with murdering a person to the grand jurors unknown, which describes the deceased as John Doe, is sufficient.

2. ——: **Motion to Quash: Disqualification of Grand Jurors.** A motion to quash the indictment, made after the defendant had been arraigned and had pleaded not guilty, on the grounds (1) that the grand jury was not drawn in accordance with the statutes, (2) that they were not duly served ten days before the first day of the term, (3) that two of the grand jurors had served as petit jurors in said court within less than one year, and (4) because said grand jury was not duly charged by the judge of the court, was properly overruled.

3. ——: ——: **Service on Petit Jury: Personal to Juror.** The objection that a grand juror has served as a petit juror within one year, is personal to him, and an objection that he is exempt from grand jury service on that account is available only to him. It does not affect the validity of the indictment.

4. **MURDER: INSANITY: Instructions for Second Degree.** Where defendant was clearly guilty of murder in the first degree, or guilty of no crime at all because of his insanity or because he was an imbecile, the court's refusal to instruct on murder in the second degree, is not error.

5. ——: ——: **No Motive for Crime.** Defendant was an Italian, and he and some other Italians had gone from near St. Louis to Crystal City, and the next day to Festus to buy some' cooking utensils, and as three of them were walking up the sidewalk defendant suddenly began to shout, "Me kill him," and shot one of them, and fired twice at the others as they fled, followed by him. The others were not witnesses, and could not be found. There was evidence tending to show that defendant was either an imbecile or at least partially insane at times, and equally satisfactory testimony that up to the time of the homicide he was sane. *Held*, there being but one issue in the case, and that whether defendant was sane or insane, that question was for the determination of the jury; and while, if defendant's father's testimony is to be credited, the absence of any quarrel or any motive for the killing is the strongest indication of insanity, yet the threat of defendant to kill deceased and its execution and the absence of the companions of deceased, leave the impression that the real

motive does not appear in the record; and the case having
been submitted to the jury under very proper instructions, and
all evidence offered by defendant having been admitted, the
appellate court will not interfere with the jury's verdict find-
ing defendant guilty.

6. **VERDICT: Amendment: Punishment.** It is the duty of the
court to see to it that verdicts are in proper form. The verdict
as returned read: "We, the jury, in the case of the State of
Missouri against Vincent Sartino, find the defendant, Vincent
Sartino, guilty of murder in the first degree and we fix his
punishment for the same at life imprisonment in the peniten-
tiary." The court being of the impression that the punish-
ment clause of the verdict was not in proper form, requested
the prosecuting attorney to prepare a proper verdict, and the
jury then went to their room and afterwards returned the
same verdict except the punishment was changed to "im-
prisonment in the penitentiary during his life." *Held,* entirely
proper.

Appeal from Jefferson Circuit Court.—*Hon. Jos. J.
Williams,* Judge.

AFFIRMED.

*Herbert S. Hadley,* Attorney-General, and *F. G.
Ferris,* Assistant Attorney-General, for the State.

(1) (a) The indictment substantially charges
every essential element of the offense of murder in
the first degree. It fully informed defendant of the
nature and cause of the accusation against him, and
is sufficient. State v. Horn, 204 Mo. 528; State v.
Richardson, 194 Mo. 329. (b) In charging murder
it is not necessary to allege that the weapon was
deadly and dangerous. State v. Hottman, 196 Mo. 122.
(2) Defendant's motion to quash the indictment was
properly overruled. Said motion went to the com-
petency of the grand jurors, who returned the indict-
ment, and to the manner of choosing and empaneling
them. The motion does not set forth any statutory
ground for a challenge. Furthermore, it was not
shown that objection was made to the competency of

the grand jurors before they were sworn. R. S. 1899, secs. 2487, 2488; State v. Crane, 202 Mo. 71; State v. Paulsgrove, 203 Mo. 206; State v. Speyer, 182 Mo. 92; State v. Holloway, 156 Mo. 222. (3)   The only issue of fact in this case is the question as to whether defendant was sane or insane at the time he killed his unoffending companion.   While there was testimony tending to establish defendant's insanity, there was, on the other hand, ample testimony to justify the jury in reaching the conclusion that he had the mental capacity to distinguish between right and wrong with respect to his act.   That issue was properly submitted to the jury upon fair and oft-approved instructions, and the record discloses no evidence that the verdict was the result of passion or prejudice.   State v. Crane, 202 Mo. 85.   (4)   The court may give the jury a form for their verdict, and may require the jury to amend their verdict.   State v. De Witt, 186 Mo. 70;   State v. Miles, 199 Mo. 554;   State v. Jones, 106 Mo. 311;   1 Bishop, Crim. Proc., sec. 831.

GANTT P. J.—At the January term, 1908, of the circuit court of Jefferson county, the grand jury returned an indictment against the defendant for murder in the first degree at said county on the 11th day of October, 1907, of a person whose true name to the grand jurors was unknown.   On the 28th of that month, the defendant was duly arraigned and entered his plea of not guilty as charged in the indictment.   Afterwards on the 30th of March, defendant filed his motion to quash the indictment on the ground that the grand jury which preferred the same was not drawn in accordance with the statutes of this State and were not duly served at least ten days before the first day of the term and because two of the grand jurors had served as petit jurors in said court within less than one year before the drawing of the said grand jury, and because the grand jury was not

duly charged by the judge of the circuit court.  This motion was heard and overruled on the first day of April, 1908.  Afterwards on the 3rd day of April, 1908, the defendant was put upon his trial and found guilty of murder in the first degree and his punishment assessed at imprisonment in the penitentiary for life. Within due time the defendant filed his motions for a new trial and in arrest of judgment, which were heard and overruled, and afterwards at the same term the defendant was sentenced in accordance with the verdict and from that sentence he has appealed to this court.  The defendant is not represented in this court by counsel.

The evidence on the part of the State, as well as on the part of the defendant, established that an Italian, whose name was unknown, was shot in the back of the head by the defendant and instantly killed, about one o'clock of the afternoon of October 11, 1907, on the sidewalk about two hundred yards east of the corporate limits of the town of Festus, as the deceased and two other Italians were going from Festus to Crystal City in Jefferson county.  Mrs. Nettie Rowden and her niece, Miss Laura Ackerman, and Charlie Stratman, were witnesses to the killing.  Mr. Stratman was driving a coal wagon eastward and was in the street opposite a few feet distant from the said Italians when the shooting occurred.  Mrs. Rowden and her niece were traveling westward toward Festus, and had arrived within fifteen or twenty feet of the Italians at the time of the shooting.  According to these three witnesses for the State the three Italians were running eastward on said sidewalk, and the defendant was about twenty or thirty feet behind the other two, who were running from him.  The two in front were shouting something like "Hay! Hay!" and the defendant who was following immediately after them said, "Me kill him, me kill the son of a b————," and as he said this he fired the fatal shot from a revolver.  The

deceased fell at the first shot. The defendant then fired two other shots at the other Italians, following them around Mrs. Rowden and Miss Ackerman into the road near Stratman's team. The fleeing Italians picked up rocks from the road as if to defend themselves, and the defendant then turned and went back westward in the road to Festus, where he met Marshal Griffin and surrendered himself. The two Italians who were with the deceased at the time he was shot, were witnesses, and could not be found.

The defense was insanity. The father of the defendant Salvatore Sartino testified that he was present on the 11th of October, 1907, and was one of a party of six Italians, including himself and the defendant, who had arrived at Crystal City that morning from Dago Hill in St. Louis. They had rented them a shanty at Crystal City, and left their valises and come to Festus together for the purpose of buying some cooking utensils. They had finished their purchases, had eaten their lunch, and started back to Crystal City when the shooting took place. The four Italians who formed the party with himself and defendant were strangers to him and to the defendant. He and the defendant had not met them prior to that day, when an acquaintance was struck up as they were going to Crystal City in search of work. He testified that there had been no quarrel between the defendant and any member of the party prior to the shooting. He said that they were leaving the town of Festus on this occasion and the defendant stopped and for a time contemplated a show picture on a billboard, while he and the other Italians walked on slowly. After some minutes, about ten minutes he thought, the defendant came running after them and just as he overtook them, he exclaimed, "Stop or I will kill you," and fired the fatal shot as he said this. The defendant was only about three feet from his victim when he shot, and he had uttered no words prior to the time of the shooting. The defend-

ant fired two other shots and then retreated up the road to Festus. This witness described the defendant as looking "wild and crazy" at the time of the shooting. He had endeavored to talk to the defendant about the homicide since that day, but had never been able to get any satisfactory statement out of him. This witness stated that he was forty-five years old; had been in the United States ten months; that his father, the grandfather of the defendant, had died of cholera before the witness was born, but it was a matter of family history that said grandfather Sartino was "kind of off; a little wild; out of his mind;" that said grandfather sometimes beat his wife and that his mother, the grandmother of the defendant, was afflicted with insanity and died of that disease. He also testified that defendant's maternal grandmother "gets kind of crazy and takes a stick and beats the married daughter, and everything like that." He stated that defendant was his oldest child, and was about twenty years old. Defendant was raised in Italy in a home which consisted of two rooms over a shop. The boy was never in school and had no education. He began helping in witness's blacksmith shop at the age of seven years and continued his work in the blacksmith shop until he came to America when he was about seventeen years old. At the age of thirteen years, defendant was severely frightened by an old lady, who came upon him with a stick while he was playing with a little girl in the street, and defendant had never been any good since. He was treated eight days by a doctor and fifteen days by another doctor and then resumed his work in the blacksmith shop, but after that scare defendant would have spells lasting one or two hours about every two or three months. At such times he would shake his head and drop to the floor, lie there awhile and then get up and shake his head and he would then resume his work. He accounted for several scars on the defendant's head by saying they were

caused by knocking his head against the wall when in these spells. He testified that these spells continued up to the time defendant left Italy for America. He did not know of his having had any of these spells in America. Since the defendant had been in America he had sent his father out of his earnings $340.

Russell Antonio, a brother-in-law of defendant's father, testified that he did not know that his sister, the mother of the defendant, ever had had any disease of the mind. He corroborated the father as to the scare which had been given the defendant when he was thirteen years of age. He also stated that the defendant's maternal grandmother was "kind of light headed," and at times she would feel dizzy in the head. For a number of months defendant had lived with witness at Dago Hill, and he had not known of his having a spell or fit during that time, although he knew he had them in Italy.

The defendant also proved by two other witnesses that since the homicide on one occasion the defendant had had a spell when his father endeavored to talk with him, he doubled up in his chair, shaking his head all the time, slapping at his father and acting as if he did not want his father to speak to him. One witness said defendant appeared like he was wild and another said he thought it was just as much meanness as anything else.

Charles E. Waters, a witness for the defendant, testified that he was in jail with the defendant before defendant's preliminary trial; that defendant had a very poor knowledge of the English language, he spoke a broken Italian. During the time he was in jail with the defendant he acted lively and friendly at times and then again he was very morose. Defendant told him that he had shot one man in the back of the head and had also shot another man, and that he did the killing becaused the deceased had killed his father.

Three other witnesses testified to a fight that defendant had in the jail with a prisoner named Mike.

Charles Frazier, deputy sheriff and jailor, testified to the defendant's conduct in jail, and gave it as his opinion that the defendant was perfectly capable of distinguishing right from wrong at all times he saw him, unless it was the one time in the office, on which occasion he thought he might be putting on.

The picture on the billboard, which was referred to as the one the defendant had looked at just before the shooting, was one in which one man was represented as having a paper and another man was holding him up with a gun, at the same time reaching up to secure the paper.

The two Italian interpreters testified that they had endeavored to converse with the defendant since the homicide, but had failed to elicit any intelligent statement.

Dr. J. E. Jones, the jail physician, testified that he had examined the defendant and in his opinion he was an imbecile, and a criminal. He testified that imbeciles do not have delusions. He testified that, if the facts included in the hypothetical questions propounded by the prosecuting attorneys, were true, defendant was not an imbecile.

Dr. Thomas B. Taylor, a physician and surgeon of thirty-six years practice, and who had had experience practicing in an insane asylum, gave it as his opinion on hypothetical questions propounded by defendant's counsel, and without having examined the defendant, that defendant was not responsible and was to a limited degree insane. On cross-examination he stated that if a man commits an act and was afterwards able to tell all about it, he was not in a condition of imbecility or insanity at the time he committed the act.

Henry Dahl, the sheriff of the county, testified for the State in rebuttal, that he had seen the defendant while in jail almost every day and often several times

a day, and had frequently talked with him. He said that the defendant was able to speak English to a small extent, and from his conversation with him and his observation of the defendant's action while in jail and in his custody, in his opinion he was not insane. He had never seen him act in any way that indicated insanity, but once in a while he would get mean, get to cutting up and make a disturbance, which was a very common occurrence with men confined in jail.

I. The indictment is in all respects sufficient and in the often-approved form. It described the deceased as John Doe (whose true name was to the grand jurors unknown) and this was sufficient.

II. The motion to quash the indictment because of irregularities in the drawing and summoning the grand jury, made as it was after the defendant had been arraigned and had pleaded not guilty, was properly overruled. The challenge was to the array and neither of the grounds allowed by the statute was alleged, to-wit, that either of the grand jurors was the prosecutor or complainant or a witness on the part of the prosecution. [Secs. 2487 and 2488, R. S. 1899; State v. Crane, 202 Mo. l. c. 71, et seq.; State v. Holcomb, 86 Mo. 371.]

As to the objection that two of the grand jurors had served as members of the petit jury selected as members of the grand jury which returned the indictment, it suffices to say that this objection was not made before the grand jury was sworn. [Sec. 3763, R. S. 1899.] This objection was unavailable any way to any one but the jurors themselves. As they did not claim their exemption when they were sworn, and it not appearing that they were objectionable for any other reason, the motion was properly overruled on this ground also. Provisions of this character have generally been held to be directory only. [State v. Griffin, 87 Mo. 608, and cases cited.]

III.   The instructions given by the court covered every phase of the case and those ·on insanity as a defense were such as have often been expressly approved by this court.   There was no error in refusing those requested by defendant for the reason that those given by the court fully presented the law of the case.   Clearly there was no error in refusing the instruction prayed by defendant on murder in the second degree. There was not a circumstance to reduce the homicide to any degree less than murder in the first degree, if the defendant was sane.

IV.   In view of the testimony of defendant's father, there was but one question of fact to be determined by the jury, and that was the sanity or insanity of the defendant.   There was evidence tending to show that the defendant was either an imbecile or at least partially insane at times and yet there was equally, if not more satisfactory evidence that, up to the time of the homicide, he was sane.   The absence of any quarrel, if the father's testimony is to be credited, or any other apparent motive for the killing, is really the strongest indication of insanity, but the threat of the defendant and its execution and the absence of the other Italians, leaves the impression that the real motive does not appear in the record.   On this question the court admitted all the evidence for defendant and gave as favorable instructions as defendant could desire and the jury who were charged with the duty of finding the fact, with a much better opportunity to observe than we, found against defendant's plea of insanity and we cannot say there was not sufficient evidence to justify them in so doing.   Certainly there is nothing in the record to indicate passion or prejudice in reaching the verdict.

V.   In the absence of any assistance by way of argument or brief on the part of the defendant, we

have looked to the motions for new trial and in arrest of judgment to ascertain the grounds of complaint and among those not already noted is an exception to the action of the court in having the jury correct the form of their verdict. As originally returned into court, the verdict was, "We, the jury, in the case of the State of Missouri against Vincent Sartino, find the defendant, Vincent Sartino, guilty of murder in the first degree and we fix his punishment for the same at life imprisonment in the penitentiary." The circuit court being of opinion that the punishment clause of the verdict was not in proper form, requested the prosecuting attorney to prepare a proper verdict, and the jury then were sent to their room and afterwards returned the same verdict except it changed the punishment to "imprisonment in the penitentiary for and during his life." This was entirely proper. The court not only may but ought to see that verdicts are in proper form. Certainly in this case there is absolutely no doubt that the verdict as amended was in effect the same as that first returned into court except it was in proper form. [State v. DeWitt, 186 Mo. 70; State v. Miles, 199 Mo. 554.] A consideration of the whole record discloses no reversible error and accordingly the judgment must be and is affirmed. All concur.