THE STATE v. ADAM RICHETTI, Appellant.—119 S. W. (2d) 330.

Division Two, August 17, 1938.

1016

*Ralph S. Latshaw* and *James D'aleo* for appellant.

*Roy McKittrick,* Attorney General, *J. E. Taylor* and *Olliver W. Nolen,* Assistant Attorneys General, for respondent.

ELLISON, J.—The appellant was convicted of murder and sentenced to be hanged for killing Frank Hermanson, a policeman, in the so-called Union Station Massacre at Kansas City on June 17, 1933. The record and briefs are long, containing respectively 1163 pages and 281 pages. Appellant makes twelve assignments of error based on more than a hundred citations of authority, which complain: (1) of the trial court's refusal to quash the indictment because the grand jury returning it had been improperly selected; (2) that there was no substantial evidence to support the verdict; (3) that the verdict was the result of passion and prejudice induced by notoriety given the homicide and the appellant in the public press and by misconduct of State's counsel and errors committed during the trial; (4) of the improper admission of evidence; (5) of the giving of an erroneous instruction; (6) and of prejudicial statements and arguments made by the prosecuting attorneys.

We shall state the facts bearing on each assignment in the discussion thereof. Of the general facts it will be sufficient to say here that about seven-fifteen o'clock in the morning of June 17, 1933, four Federal agents and three police officers, including the deceased Hermanson, were transferring a convict named Frank Nash from a train which had just arrived at Union Station in Kansas City to an automobile standing with many others in a parking space in front of the station. Three of the officers had seated themselves on the back seat of the car, the convict, Nash, was on the front seat under the steering wheel, three other officers were standing to the west or right of the car, and one to the left, when a barrage of machine gun and pistol shots was turned upon them by two or three men who had been lurking behind adjacent automobiles. The convict, Nash, and four of the officers, one being Hermanson, were killed and agent Lackey was wounded. Only agents Vetterli and Smith escaped unscathed. The murderers, whoever they were, fled and escaped. The State's evidence tended to show the appellant was one of them. The defense was an alibi.

I. On June 10, 1935, at the beginning of the trial the appellant filed a motion to quash the indictment, complaining that the grand jury which returned the indictment was improperly selected, in violation of his constitutional right to equal protection of the law under the Fourteenth Amendment and the holding in the Scotts-

boro case, Norris v. Alabama, 294 U. S. 587, 79 L. Ed. 1074, 55 Sup. Ct. 579, and State v. Warner, 165 Mo. 399, 65 S. W. 584, 88 Am. Rep. 422. The facts pleaded in this part of the motion were:

"Because the indictment in this case was not returned by a Grand Jury duly summoned and chosen from the County of Jackson and State of Missouri, in . . . that the Grand Jury wheel from which the names are drawn and were drawn to comprise the Grand Jury that returned the indictment in the present case does not include the names of any citizens of Negro, Italian, Greek, Chinese or Japanese extraction or race, although there are many of such Negro, Italian, Greek, Chinese and Japanese citizens of Jackson County who are duly qualified to serve as Grand Jurors in Jackson County, Missouri, and at the time this indictment was presented and filed, the same condition existed, and that said names of said qualified citizens as hereinbefore stated were not in the Grand Jury wheel at the time the indictment in this case was presented and filed; that the names of said above described persons never were in the Grand Jury wheel of Jackson County, Missouri, and are not now in said Grand Jury wheel of Jackson County, Missouri."

The homicide with which the appellant was charged occurred on June 17, 1933. He was apprehended in Ohio in October, 1934, and brought to Boone County, Missouri, on the assumption that he had committed a homicide there. Later he was taken to Jackson County, arrested on November 4, 1934, and incarcerated for "safe keeping." The grand jury was impaneled and sworn on February 25, 1935, and the indictment on which this prosecution is founded was returned on March 1, 1935. From all this it appears that the appellant had been in custody for sixteen weeks before the grand jury was sworn.

Section 3514, Revised Statutes 1929 (Mo. Stat. Ann., p. 3136), provides: "Any person held to answer a criminal charge may object to the competency of anyone summoned to serve as a grand juror, before he is sworn, on the ground that he is the prosecutor or complainant upon any charge against such person, or that he is a witness on the part of the prosecutor. . . ." Section 3515, Revised Statutes 1929 (Mo. Stat. Ann., p. 3136), declares: "No challenge to the array of grand jurors, or to any person summoned as a grand juror, shall be allowed in any other cases than such as are specified in the last section."

These two sections have appeared consecutively in our statutes since the adoption of our first criminal code, Revised Statutes 1835, sections 2, 3, page 79. And it has been held for nearly one hundred years that challenges to the array of grand jurors or to individual members of the grand jury can be made only by the persons, within the time, and for the reasons specified therein. [State v. Bleekley, 18 Mo. 428, 431; State v. Welch, 33 Mo. 33; State v. Connell, 49

Mo. 282, 287; State v. Sartino, 216 Mo. 408, 416, 115 S. W. 1015, 1017; State v. Washington, 242 Mo. 401, 408, 146 S. W. 1164, 1165-6; State v. Christopher, 327 Mo. 1117, 1122, 39 S. W. (2d) 1042, 1043-4; State v. Shawley, 334 Mo. 352, 366, 67 S. W. (2d) 73, 81.]

The learned Assistant Attorneys General invoke these statutes and decisions. The appellant relies on State v. Warner, 165 Mo. 399, 414, 65 S. W. 584, 587, 88 Am. St. Rep. 422, and Norris v. Alabama, supra, 294 U. S. 587, 79 L. Ed. 1074, 55 Sup. Ct. 579. These two cases hold a State cannot deprive a defendant of his constitutional right to equal protection under the law either by action of its Legislature (that is, by statute) or of its courts. This is true not only of his final trial but also of grand jury proceedings where a mere criminal charge against him is returned. And it is further decided by the Warner case, State v. Bobbst, 269 Mo. 214, 222, 190 S. W. 257, 259, and the Shawley case, supra, that where an accused held to answer a criminal charge requests and is denied, before the grand jury is sworn, the right to be present and challenge the array or any individual juror, he does not lose that right but may exercise it later by an attack upon the indictment, the statute to the contrary notwithstanding. So far, it must be taken as settled that the statute is not controlling.

But these cases also hold that where the defendant fails to *request* such privilege he is bound by the statute. In the instant case it appears that the appellant had been in custody for nearly four months before the jury was sworn, and had ample time to proceed in accordance with the statute. He did not plead and prove that he made such request, or any other facts tending to excuse his belated attack upon the indictment. For this reason the trial court's action in overruling his motion to quash the same was proper. This question is further discussed in State v. Arthur King, 342 Mo. 975, 119 S. W. (2d) 277, the opinion in which is delivered herewith. [See, also, State v. Logan (Mo. Div. 2), 111 S. W. (2d) 110.] In disposing of the assignment as we have, we do not mean to hold appellant's motion stated a good cause of action, i. e., that he, an Italian, could complain of the exclusion of Negroes, Greeks, Chinese and Japanese from the grand jury without some showing that he was thereby prejudiced.

II. The next assignment is that the trial court erred in refusing to sustain the appellant's demurrer to the evidence. The State's theory was that appellant with two notorious criminals "Pretty Boy" Floyd and Verne Miller, perpetrated the massacre in the attempted execution of a conspiracy to liberate convict Nash. All three were identified by eyewitnesses: Miller, by Federal agent Smith; Floyd, by agent Vetterli and Mrs. Lottie West, a social worker for the Travel Aid Society at Union Station; and the appellant by Mrs. West and agent Lackey. In addition it was proven by the State and admitted by the appellant that he and Floyd had

come to Kansas City about ten-forty-five o'clock the night before the massacre at the end of a flight across parts of Missouri and Kansas in which they had kidnaped Sheriff Killingsworth of Polk County and Walter L. Griffith of Clinton. The appellant denied that he was in Kansas City "the morning day or night of Saturday, June 17, 1933," the date of the massacre, and also denied that he had been at Union Station any time that day. That was all of his testimony; he did not say where he was during this time. Sheriff Bash of Jackson County testified that appellant told him he came to Kansas City the evening of June 16 and left some time the middle of the night or early morning, and that he was not in the city before or after these hours.

Further, there was evidence that during the massacre the man identified as Floyd used a machine gun having all the physical characteristics of one that Floyd and appellant had in their possession during the kidnaping trip and sixteen months thereafter when appellant was arrested and Floyd killed in Ohio. Also there was ballistic evidence tending to prove that an automatic pistol which Floyd had on the kidnaping trip and at the time of his death was used in the massacre. Both these firearms were admitted in evidence along with a pistol which was found on Floyd's body. But there was no ballistic or other evidence connecting the latter two weapons with the massacre. In addition to this it was shown that appellant's finger prints were found on a beer bottle left in the home of Verne Miller, one of the killers, after his flight following the massacre. And finally for the purpose of establishing a motive for the killings and showing the inception of the conspiracy the State proved that Miller had two telephone conversations with the wife of convict Nash and Dick Galatas at ten-seventeen P. M. and twelve-five A. M. next before the massacre, in which they informed him on what train the Federal agents would pass through Kansas City, and he told her she would see her husband again.

The appellant assails all this evidence, saying the testimony identifying him was contradictory and destroyed by impeaching evidence; that the firearms were improperly admitted in evidence; that the ballistic and finger print evidence was disconnected, speculative and remote; that in the adduction of much of the evidence detailed proof of the commission of other crimes by the appellant was admitted in violation of his rights; and that the alleged telephone conversations were hearsay. To save repetition, though at the sacrifice of continuity, we shall state and pass upon the objections presented by appellant to each class of the State's evidence in the discussion of that evidence and its probative value.

Identification of the appellant as one of the killers was made by Mrs. West and agent Lackey. We take up her testimony first. As stated, she was a social worker for the Travel Aid Society, and had

also been a parole officer and police woman. On the morning of the massacre she got to work about seven o'clock and found a man sitting in a chair near her desk by the station door. She spoke to him but he left without replying. From a photograph she identified him as Pretty Boy Floyd. Shortly thereafter the officers came through the station lobby past her desk with the convict, Nash, and passed out the door. She followed them, escorting to the sidewalk curb a group of Catholic Sisters who desired to take a taxicab,

Outside she saw the officers with the convict grouped about and entering an automobile headed south in the parking space beyond the broad driveway south of the station. Then she saw two men standing on the running board of her own automobile which was parked some fifty feet southwest of the officers' car. She described their appearance, roughly, and said they were looking over the top of the car. Next she saw "this man," whom she identified as Pretty Boy Floyd come around (north) to the center of the driveway behind the officers' car and start firing into their backs with a machine gun. She also observed a blond man to the southwest beyond some cars firing a gun that looked like a machine gun. She had never seen that man since. For about two minutes she also saw a third man, shorter and darker than the other two, wearing a grayish or brownish suit with a turned down hat, firing from the southeast toward the officers with two pistols, one blue, in his right hand, and one which seemed to be nickle plated in the sunlight in his left hand. She identified him as the appellant in the court room. Then she ran back into the station, but did see Floyd walk past the slain officers to a car on beyond, and depart going west.

Impeaching this testimony it was proven for the appellant by Chief of Detectives Higgins of Kansas City that shortly after the massacre he showed Mrs. West a number of photographs including some of Pretty Boy Floyd but she did not identify them and picked out a picture of Bernard Phillips. Mrs. West declared she didn't remember seeing it, and denied identifying any of these pictures though she conceded that one looked very much like the man with the machine gun. She couldn't recall that she was ever shown a picture of appellant, and said she didn't identify him until he was brought back to Kansas City from Ohio.

In other respects her testimony is assailed. She said: three of the officers escorting the convict had riot guns when there were only two; that agent Vetterli had a revolver when he says he was unarmed; that the appellant was in the parking lot firing from the southeast toward the front and side of the officers' car, whereas agent Lackey said (as we shall presently see) that appellant was west and north of the officers' car; that she was at her desk near the exit door of Union Station talking to the Catholic Sisters when the agents with convict Nash passed by, whereas she had testified in another case

that she was standing at Door B on the opposite side of the lobby talking to some station officials at that time. In answer to this Mrs. West explained she was by Door B as stated when the convict convoy entered the lobby and that she followed them over to her desk by the outside door where the Catholic Sisters were standing.

Further criticisms of her testimony are made because of alleged inaccuracies in her estimates of time and distance and her descriptions of known persons; because of her failure to see what other people saw; and because it would have been impossible for her to see the massacre in the parking lot across the station driveway owing to the heavy cab traffic at the station door at that hour when many trains were arriving. On this point the appellant presented the testimony of cab starter Fritts, on duty on front of the station door, a red cap usher named Scott, and three cab drivers, Lynn, Orr and Parman. Scott said he was assisting an invalid into a cab when the firing started. In this he was corroborated by Fritts and Lynn. Mrs. West did not see that. All these men except Parman took shelter behind the cabs. Fritts, Lynn and Orr testified Mrs. West was not out in front of the station while the shooting was in progress, did not come out until it was over, and even then only advanced as far as the exit doors. But usher Scott corroborated Mrs. West by saying she seemed to be there when the firing began, at least he heard her talking. She ran inside and came out with a policeman. And when chauffeur Parman was questioned concerning a written statement he had given the prosecuting attorney that "at the time of the shooting I saw Mrs. West standing in the door of the Union Station" he answered "She was standing back inside the door at the Station." But on redirect examination he said that answer referred to a time after the shooting was over. Parman saw the whole massacre, Fritts saw it begin, and he, Scott and Orr saw the killers leave, driving west. None of them could identify appellant as one of the gunmen, but they also were unable to say he was not.

Agent Lackey was seated on the west side of the back seat of the officers' car. He saw one gunman standing behind the next car west with a gun with a vertical grip pointed at them, and another man going north from that point until he got to the back of the car. The back windows of this adjacent car were up but the front windows were partly down. Through them he could see the man's head and the part of his torso above the car body but not his hands or weapons. His view necessarily was brief. Mr. Lackey said the man wore a brown coat, felt hat with turned down narrow brim, and was dark complectioned; he gave an estimate of his height and weight which checked pretty closely with that of appellant; and he identified the man as the appellant.

The shooting started immediately afterward and from the rear of the car agent Lackey was shot three times in the spine. He was par-

alyzed for several seconds but did not become unconscious. At the hospital less than two hours later he was interviewed by detective Eldridge, who testified that Lackey appeared to be suffering intense pain and was very nervous, and that he said "it was all a flash to me, I couldn't tell who it was;" also that the two men he saw appeared to be Americans. On cross-examination Mr. Lackey said he couldn't remember whether he made that statement. He admitted that he may have told newspaper men, "it was all so quick I don't think anyone knew what happened;" that all he got was a fleeting glimpse; and that he couldn't see who the men were because of the blur on the window of the adjacent car through which he was looking.

Other facts proven in behalf of appellant were that immediately and for some time after the massacre the authorities suspected members of the gang of convict Nash; Bernard Phillips, Harvey Bailey, Wilbur Underhill, Bob Brady and Jim Clark; that circulars were issued by the Government for these men; that no circular was issued for Pretty Boy Floyd for some time, and none ever was issued for appellant; that Mrs. West was taken to the Federal Penitentiary at Leavenworth to view some of the convicts there; that agent Vetterli partially identified Bob Brady as one of the killers. It was also shown that the seven radio broadcasts sent out by the Kansas City Police Department within the hour immediately following the massacre described the killers as two white men in blue or dark shirts, with machine guns. The State permitted the defense to prove further that the first Federal indictment, filed in September, 1933, charged eleven persons with conspiracy to liberate the convict Nash on the occasion of the massacre; that only one of these eleven was a person shown by the evidence in the instant case to be involved in the actual massacre, namely, Verne Miller; that appellant and Pretty Boy Floyd were not charged until a second indictment was filed on November 5, 1934.

Appellant contends all this impeaching evidence destroys the identification testimony for the State; and that we should reject the latter under such decisions as State v. Huff, 161 Mo. 459, 487, 61 S. W. 908, 1104; State v. Prendible, 165 Mo. 329, 353, 65 S. W. 559, 566; State v. Bass, 251 Mo. 107, 126, 157 S. W. 782, 787; State v. Edmundson, 218 S. W. 864, 867; State v. Welton, 225 S. W. 965, 968; State v. Gregory, 339 Mo. 133, 143, 96 S. W. (2d) 47, 52. We do not think so. There are inconsistencies and contradictions in the testimony of the State's witnesses, but they are corroborated by other evidence, which we shall take up next.

Agent Vetterli testified that a certain Thompson sub-machine gun introduced in evidence and marked State's Exhibit 7 had the physical characteristics of a machine gun he saw Floyd shooting during the massacre. Mrs. West said Floyd was firing a machine gun. Chauffeur Parman saw a man firing a machine gun. Agent Lackey

also testified that he saw a heavy set, broad shouldered man with a round face, wearing a faded Panama hat turned down all the way round, shooting a gun with vertical grip. He could not positively identify the man, but this description seems to fit Floyd better than either of the two other killers.

The kidnaping of Sheriff Killingsworth by the appellant and Pretty Boy Floyd occurred at Bolivar, Missouri, about seven-thirty A. M. the day before the massacre. By a devious route over country roads they drove to Kansas City arriving there about ten-forty-five P. M. Appellant held the machine gun during the latter half of the trip. On the way, Floyd permitted the sheriff to examine it. He owned one like it, and noticed that half of the figures of the model number thereon, 1921, were ground off. At the trial Sheriff Killingsworth positively identified the machine gun, Exhibit 7, as the one he saw in the possession of the outlaws.

Sixteen months later, in October, 1934, appellant and Floyd were discovered by some citizens loitering on the outskirts of Wellsville, Ohio, in circumstances that aroused their suspicion. They called Chief of Police Fultz. Both men resisted arrest and fired their pistols at the officer. Then appellant fled but presently returned and surrendered. In the meantime Floyd picked up a machine gun lying on the ground under or near a blanket on which the appellant had been reclining, and fired it at the officer until the handle broke. Then Floyd threw it down and escaped until the next day when he was killed by Federal agents at another point in the same vicinity. Chief Fultz took the gun and he likewise identified at the trial the machine gun, Exhibit 7, as being the gun he captured in Ohio.

Appellant argues Sheriff Killingsworth's identification of the machine gun was insufficient because other similar guns might have had the model number ground off in the same way; and that some private mark thereon would be necessary to make the identification certain. He claims further that Floyd, not appellant, was the one in possession of the machine gun on the two occasions mentioned above, and that proof of possession of the gun in Ohio sixteen months after the massacre was too remote, citing State v. Richards, 334 Mo. 485, 492, 67 S. W. (2d) 58, 60, where it is said "articles found on a person other than the defendant on trial, long after the commission of the offense, are not admissible against the defendant *minus a showing of some connection of the articles with the defendant*." (Italics ours.) We think the evidence here did connect the appellant with the machine gun both in Ohio and on the kidnaping flight; that there was substantial identification of it as one of the machine guns used in the massacre; and that the evidence was competent and not too remote. [16 C. J., sec. 1225, p. 618; State v. Nasello, 325 Mo. 442, 468, 30 S. W. (2d) 132, 141 (39); State v. Mangercino, 325 Mo.

794, 802, 30 S. W. (2d) 763, 765 (2).; State .v. McGee, 336 Mo. 1082, 1095, 83 S. W. (2d) 98, 106 (19).]

An automatic pistol, Exhibit 8, also was admitted in evidence. It was a .45 caliber Colts automatic which had been arranged with a "conversion" to shoot full automatic when the trigger was held down. This weapon was identified by Samuel K. McKee a Federal agent, as one he took from the belt of Pretty Boy Floyd when the latter was killed by Federal agents in Ohio in October, 1934, the day after appellant's arrest. Sheriff Killingsworth also identified the pistol as having been in the possession of Floyd or appellant, he thought Floyd, on the kidnaping trip the day before the massacre. He identified it by the "contraption" on it.

The State produced ballistics evidence tending to connect the pistol Exhibit 8 with the massacre. The witness McKee took it from the body of Floyd, and two days thereafter delivered it to Melvin Purvis, Federal Agent in charge of the Chicago office of the Federal Bureau of Investigation. Purvis handed the pistol to Harry Wild, a clerk in said office, who forwarded it by mail to the Bureau in Washington. It was received in the original package by Thomas F. Baughman, assistant director, who turned it over to Seth Wiard a ballistics expert in the bureau. Mr. Wiard restored the number which had been ground off the pistol, serial number 84,197, and fired a bullet therefrom. He scratched an identification mark upon the empty cartridge from which the bullet had been discharged, and mailed the cartridge to the St. Louis Division office of the Bureau of Investigation, then in charge of Federal Agent Vetterli. This *test* cartridge was designated as Exhibit 11 at the trial. All of the foregoing acts (or facts) severally were detailed on the witness stand by the above mentioned persons who performed the same.

Now, going back to the massacre. Within less than an hour thereafter Thomas Higgins, Chief of Detectives of the Kansas City Police Department, searched the scene of the shooting and found, among other things, a pistol cartridge on the ground in the rear of the automobile in and about which the officers were slain. He marked a T on the inside of it with a pen and the next day turned the cartridge over to Merle Gill, ballistician for the Department. This *evidence* cartridge was known as Exhibit 21 at the trial.

About a year and a half later on December 1, 1934, Major Means of the Missouri State Highway Patrol handed to ballistician Gill the aforementioned Exhibit 11, the *test* cartridge. Gill examined the primer ends or discs of the two cartridges, Exhibits 11 and 21, with a comparison microscope whereby he was able to compare the marks impressed thereon by the file scratches and other microscopic rough places on the pistol breech against which the cartridges had been fired. He found they had been fired in the same pistol, at least that was his expert opinion. And Exhibit 22, a greatly enlarged photo-

graph of the microscopic image taken by him, so indicates even to an untrained eye. This was substantial if not persuasive evidence. [State v. Shawley, 334 Mo. 352, 377, 67 S. W. (2d) 74, 87; State v. Mc-Keever, 339 Mo. 1066, 1081, 101 S. W. (2d) 22, 29.] It undoubtedly tends to prove that the automatic pistol, Exhibit 8, which was in the possession of Floyd the day before the massacre and still in his possession when he was killed sixteen months later, fired the shell found at the scene of the massacre.

Appellant assigns error in the admission of this pistol and the ballistic evidence aforesaid. First, he makes the broad assertion that the pistol was incompetent as evidence because at most it only tended to connect Floyd, not appellant, with the massacre, and it was taken from Floyd's body at another place a day after appellant's arrest, and many months after the massacre. But the evidence does show appellant and Floyd were acting together in the kidnaping expedition during which Floyd had the pistol the day before the massacre; eyewitnesses saw them both taking part in the massacre using pistols in the apparent execution of a conspiracy to liberate the convict Nash; the ballistics evidence indicates the pistol was fired at that time and place; they fled together, and sixteen months later were found still together in Ohio. There they acted together in resisting arrest; and they did not separate voluntarily, but when appellant was arrested Floyd escaped and was killed the next day, the pistol being found on his body. There is enough here to indicate concerted action in a general course of outlawry, including the Union Station massacre, and that the pistol was one of their implements. This evidence tends to show Floyd took part in the massacre, and in view of appellant's association with him, also tends to corroborate the identifying testimony connecting appellant therewith. We think the court did not err in admitting it. The facts are different from those in the Richards case.

Another objection is that the ballistics evidence was incompetent because there was a missing link in the chain of proof, viz.: that ballistician Seth Wiard testified he mailed the test cartridge, Exhibit 11, from Washington to agent Vetterli in charge of the F. B. I. office in St. Louis, whereas ballistician Gill swore the cartridge was delivered to him in Kansas City by Major Means of the State Highway Patrol; and there was no evidence tracing the cartridge from Vetterli to Means. There is no merit in this contention because Mr. Wiard was a witness at the trial and there directly identified the test cartridge as the one he had made and marked. [State v. Shawley, supra, 334 Mo. 352, 374, 67 S. W. (2d) 74, 85.]

Finally, appellant objects that the evidence cartridge, Exhibit 21, was merely found on the ground at the scene of the homicide shortly thereafter, and was not definitely proven to have been used in the shooting, unlike a situation where an evidence bullet is taken

from the body of the victim. This contention is without substance. As is said in 16 Corpus Juris, section 1225, page 619, "To warrant the admission in evidence of an instrument or weapon as the one with which the crime was committed, a prima facie showing of identity and connection with the crime is necessary and sufficient; clear, certain, and positive proof is not required. . . . A weapon with which the crime might have been committed, taken in connection with evidence of its finding near the time and scene of the crime, is a relevant evidentiary fact tending to show the means by which the crime was committed; and in such a case it is not necessary to connect the weapon with accused in order to render it admissible in evidence."

When appellant was arrested in Ohio Chief of Police Fultz took possession of his .45 calibre Army Colt's pistol, and the next day Federal agents recovered from the body of Floyd a .45 calibre automatic pistol, bearing number 18,001 (a different pistol than Exhibit 8 heretofore mentioned). These, respectively, were marked Exhibits 9 and 10, and were introduced in evidence. Appellant assigns error in their admission on the grounds: (1) that there was no showing that these two pistols were used in the massacre; (2) because they were not found in the possession of the two men until sixteen months thereafter; (3) because the testimony narrating the incidents of their capture was incompetent and prejudicial since it disclosed independent, unrelated crimes; (4) and in any event the pistol taken from the body of Floyd a day after appellant's arrest, and at another place, was not proper evidence against appellant.

There can hardly be any doubt about the admissibility of appellant's pistol. It is true 16 Corpus Juris, section 1056, page 549, says, "evidence that defendant had a revolver when arrested two months after the offense is inadmissible, when such revolver is not identified as the one that the offender used," citing State v. Kehr, 133 Iowa 35, 110 N. W. 149. But from the facts recited in the report of that case it does not appear that the defendant there involved was a fugitive or resisted arrest. On the other hand the same work, 16 Corpus Juris, section 1070, page 553, declares "It is proper to admit evidence of the arrest of accused and the attending circumstances, including the place of arrest, the persons then in the company of accused, the acts and conduct of accused, his declarations, his resistance of arrest, and an attempt on his part to evade, escape, or avoid arrest. . . . In showing that accused resisted arrest, it is proper to allow the witnesses to give a connected story detailing all the circumstances, even though it becomes necessary to testify to a separate crime, such as the killing of one of the posse." And again section 1225, page 619, of the same volume states: "A weapon found at or near the place of arrest is admissible in evidence as part of the history of the arrest, although it is not the weapon which was used in committing the

crime, or although it is not clearly shown to be the property of defendant. Also a weapon which was not used in the commission of the crime but which was employed in resisting arrest may be introduced as an exhibit where it supports a contention of the State in opposition to a defense set up by accused.''

Neither do we agree that the proof was too remote; or that the record is devoid of evidence connecting the two pistols with the massacre; or that the pistol Exhibit 10 taken from Floyd's body was inadmissible against appellant. Appellant and Floyd had three pistols and a machine gun on the kidnaping trip according to the testimony of Killingsworth. They used the same number and kind of firearms in the massacre next day—Mrs. West said appellant had two pistols, and the defense witness Parman saw a man in the position where Mrs. West placed Floyd firing a machine gun and a pistol. Sixteen months later when the law overtook the two fugitives in Ohio they still had three pistols and a machine gun. One of these pistols, Exhibit 8, and the machine gun, Exhibit 7, were definitely identified by Sheriff Killingsworth as being among those in the possession of the outlaws on the kidnaping trip. The machine gun was substantially identified by agent Vetterli as one he·saw Floyd shooting in the massacre. Ballistic evidence connected the pistol Exhibit 8 with the massacre.

This evidence taken together warrants an inference that the same three pistols and machine gun were used on all three occasions by the known possessors thereof, appellant and Floyd; and strengthens the testimony of the State's witnesses identifying them as participants in the massacre. On this theory it was proper to complete the accounting of the firearms recovered when the two outlaws were apprehended by including the pistol Exhibit 10 taken from Floyd's body the day after appellant's arrest. 2 Wharton's Criminal Evidence (11 Ed.), section 714, page 1205, says: ''But while the general rule is that the acts and declarations of conspirators after the end of the conspiracy are inadmissible against co-conspirators, it may always be shown that such other co-conspirators were in possession of the fruit of the crime or the weapon or instrument with which it was committed.'' [See, also, Underhill's Criminal Evidence (4 Ed.), sec. 779, pp. 1419-1421.]

The foregoing conclusion is based on the theory that the three pistols Exhibits 8, 9, and 10, all were used in the massacre. While they were offered in evidence below, they have not been brought up to this court for our inspection. Mrs. West testified one of the pistols she saw appellant using appeared in the sunlight to be nickle plated. If she meant to affirm as a fact that it was nickle plated and neither of the three exhibits is, our theory would fall. But even so, we still think the pistol Exhibit 10 taken from Floyd's body was properly admitted in evidence against appellant. The killing

of Floyd really was a continuation of the clash of the previous day when he and appellant both resisted arrest and fired at Chief Fultz. Undoubtedly the pistol and the incidents of its capture would have been competent evidence against Floyd if he had survived and stood trial. It is also competent evidence against the appellant in view of their criminal association and concerted action in and following the massacre, shown by other evidence, as we have already held with respect to the other pistol taken from Floyd's body, Exhibit 8, though that weapon tended more strongly to incriminate him because it was connected with the massacre by ballistic evidence.

 Appellant's counsel suggest all the foregoing evidence showing flight and armed resistance to arrest cannot be considered as proof of guilt in this case, because the appellant and Floyd though innocent of the Union Station massacre may have been fleeing because of the kidnaping episode or some other crime; also because appellant was not suspected of the crime until after he was arrested in Ohio. On the other hand, at another place in their brief counsel invite us as a matter of current history to take judicial notice of the fact that the crime was widely publicized in the press and on the screen, and that Floyd "was known to everyone in the United States as 'Public Enemy No. 1'" and appellant as his chief lieutenant. The evidence for the State shows that while Floyd was not one of those first circularized by the Government, and appellant never was, yet the Federal Bureau of Investigation was working hard on the case in which one of its operatives was killed and one wounded, and three policemen were killed. In these circumstances it may well be believed the appellant and Floyd were in hiding, or at least resisted arrest, because of a consciousness of guilt of this major crime.

 At this point we may as well take up another assignment made by appellant, which is closely related to the foregoing. It is contended that the trial court erred in admitting the detailed story of the kidnaping the day before the massacre because it involved the disclosure of an independent, unrelated crime having no connection with the Union Station massacre. This assignment may be disposed of with this statement. When the prosecuting attorney was about to call Sheriff Killingsworth as a witness the following occurred:

"MR. LATHSHAW: We have the deposition of Jack Killingsworth in which he narrates the kidnaping of him, Killingsworth, by Charley Floyd and Adam Richetti. With reference to this case, we admit that that was done by these two men. We ask the Court to instruct the Prosecuting Attorney to refrain from asking this witness or allowing this witness to testify that this defendant, Adam Richetti, tried to kill him at Bolivar, Missouri, but was interrupted by his, Richetti's

brother, and the further fact that along the roadway he pointed a machine gun at a state trooper and was going to shoot at him, but was stopped by Jack Killingsworth, the reason being that these are two distinct crimes and are of such a nature (as) to absolutely prejudice this defendant who is charged now with this crime alone. We think, of course that the State had a right to show that he was kidnaped and brought up but the details which show two utter distinct assaults should not be allowed.

"The Court: You don't deny that they have a right to show that at the time he was kidnaped and brought up here that Richetti did have a machine gun?

"Mr. Lathshaw: They can show that but I don't want them to show an assault, attempt to kill."

The court treated the statement of appellant's counsel as an objection and sustained it. The examination and cross-examination of Sheriff Killingsworth and Walter Griffith, the captives on the kidnaping flight, followed for 59 pages in the record, throughout which the two incidents referred to by appellant's counsel were not mentioned. Once they objected to the witness's statement that Floyd would release the safety catch on one of his pistols whenever the kidnapers' car passed automobiles carrying men. That objection was overruled but the court refused to permit the State to go into the matter further; and other similar objections were sustained. At the end of the State's case appellant moved to strike "all details of the supposed crime of kidnaping" Killingsworth. The foregoing shows that if there be any merit in appellant's assignment it was waived when the evidence was presented.

█ Twelve days after the massacre a Federal agent and finger print expert, John E. Brennen, with other officers searched the vacant residence in Kansas City where Verne Miller, one of the gunmen, had resided for over two months before and several days after the homicides. They found two beer bottles with latent finger prints thereon which became visible when dusted with powder. The bottles are designated in the record as Exhibits 25 and 26. Comparison of a five time bromide enlargement of a photograph of the finger prints on Exhibit 25, with a similarly enlarged photograph of the finger print of the right index finger of Verne Miller taken at the South Dakota penitentiary in April, 1932, showed, in the opinion of Jerry R. Murphy, finger print expert of the Bureau of Investigation at Washington, that both prints had been made by the same finger, in other words, the finger of Verne Miller. By a similar process it was shown, in the expert opinion of Mr. Murphy that a finger print on the bottle, Exhibit 26, was made by the appellant, the comparison photograph being obtained from ink impressions of his finger prints made at the jail in Kansas City on November 4,

1934. This had some tendency to prove that appellant during the night of June 16 had been at the residence of Verne Miller, one of the killers.

The appellant objects to this finger print evidence on several grounds. First he says the evidence was speculative and remote because the beer bottles had been in Miller's home at least twelve days accumulating dust, and that the oily skin excretion that made the prints had been drying out during that time so that no finger prints would be obtainable. But that is mere argument—not fact. The experts who testified on this point swore that there were legible finger prints on the bottles. Again it is contended that there is no proof as to when the finger prints were made. But appellant told Sheriff Bash, and also testified, that the only time he was in Kansas City near the date of the massacre was on the night preceding it. And finally appellant insists a link is missing from the chain of proof, because the State failed to produce as a witness the photographer who made the pictures of the fingerprints on the two bottles. This was unnecessary. The bottles were photographed in the presence of Mr. Brennen who found them, on the same day, and they and the negatives were marked by him. He identified them at the trial, and said the finger prints were still on the bottles. This proof was amply sufficient. [State v. McGee, 336 Mo. 1082, 1096, 83 S. W. (2d) 98, 106 (25).]

■ Finally, for the purpose of showing motive and the inception of the conspiracy the State proved in great detail that the slain convict Nash had escaped from the Federal penitentiary in Leavenworth, Kansas, and was apprehended at Hot Springs, Arkansas, on June 16, the day before the massacre; that the officers, returning him to Leavenworth, motored to Ft. Smith, Arkansas, and there boarded a train which arrived in Kansas City the next morning a few minutes before the massacre; that upon learning of Nash's capture his wife and Dick Galatas went by airplane to Joplin, Missouri, where they telephoned Verne Miller in Kansas City at 10:17 P. M. informing him that the Federal officers were taking Nash through that city on the train above mentioned. Just after midnight Miller 'phoned back Mrs. Nash from Union Station in Kansas City, talked with her about where she should go, and told her she would see her husband again. The State proved there was a close underworld friendship between Miller and his wife and Nash and his wife.

These conversations were out of the presence and hearing of the appellant, at least the first one must have been because at that time he and Floyd had not completed their kidnaping trip and could not have known of Nash's capture about noon that day. They arrived in Kansas City about 10:45 P. M. and it would have been possible for them to have been in communication with Miller before he had

the second conversation with Mrs. Nash a little after midnight; but there was no showing that they had been. Appellant maintains these telephone conversations were hearsay and incompetent as to him because they were had before he did or could have entered the alleged conspiracy. This theory seems to have been followed in State v. White, 316 Mo. 576, 578, 292 S. W. 411, 412, and State v. Weaver, 165 Mo. 1, 65 S. W. 308, 309, 88 Am. St. Rep. 406; but the law universally is otherwise. It is true that acts and declarations made by a co-conspirator before the *inception* of the conspiracy are not competent as against another conspirator who joins after it comes into existence. [2 Wharton's Criminal Evidence (11 Ed.), sections 711, 713, pages 1197, 1199.] But once it is established that the conspiracy had begun, acts and declarations of the conspirators in pursuance thereof are admissible against any member thereof, and the rule is the same regardless of when one becomes a party to the conspiracy. [2 Wharton's Criminal Evidence (11 Ed.), sec. 708, p. 1193; 11 Am. Jur., secs. 40, 41, pp. 571, 573.]

It is broadly stated in Underhill's Criminal Evidence (4 Ed.), section 777, page 1414, that such a belated joiner must have "had knowledge of and expressly or impliedly ratified such (previous) acts or declarations." (Parenthesis ours.) But 1 Greenleaf on Evidence (16 Ed.), section 184a, page 305, declares the rule by its legal effect, saying: "It makes no difference at what time anyone entered into the conspiracy. Every one who does enter into a common purpose or design is generally deemed, in law, a party to every act which had been done by the others. . . ." And the doctrine gathered from numerous cases in 16 Corpus Juris, section 1307, page 656, is that: "Where one joins a conspiracy after its formation and actively participates in it, he adopts the previous acts and declarations of his fellow conspirators, so that such acts and declarations, although done or made before he joined the conspiracy, are admissible against him." This rule was followed in State v. Crab, 121 Mo. 554, 563, 26 S. W. 548, 550.

From the facts of this case it is obvious that some preparation was required for the formation and execution of the conspiracy. It was necessary to acquaint the killers with the fact that Nash was in custody of the Federal agents and that they would arrive in Kansas City on a designated train at or about a certain time. It was necessary to ascertain whether they would leave the train there and proceed to Leavenworth by automobile, or whether they would continue on the same train or change trains. It was necessary to recruit gunmen and procure automobiles. The essential information was given to Verne Miller by Mrs. Nash and Galatas about 9 o'clock the night before, she says, or at 10:17 P. M. according to the telephone time stamp. He called back to her a few minutes after mid-

night from Union Station, discussing various rendevous where she could be reached, and told her she would see her husband again. This was the inception of the conspiracy and even if appellant and Floyd entered into it later that night, they were bound by the previous arrangements, under the authorities cited supra. Furthermore, the evidence was competent to show motive. [2 Wharton's Criminal Evidence (11 Ed.), sec. 711, p. 1198; 11 Am. Jr., sec. 41, p. 573.]

This completes our review of the evidence. We think the State's showing was amply sufficient to make a prima facie case; that the appellant's impeaching evidence did not destroy the State's case; and that there was no substantial error in the admission of the evidence complained of. While the identifying testimony of Mrs. West and agent Lackey is somewhat contradictory—and contradicted—and while they doubtless were excited when they witnessed the massacre, that does not make their testimony incompetent or incredible. [State v. Bagby, 338 Mo. 951, 961, 93 S. W. (2d) 241, 247 (3).] The ballistics evidence, the finger print evidence, the fact that the appellant and Floyd arrived in Kansas City a few hours before the massacre armed with the kind of equipment that was used therein, their flight and capture with like equipment, and the fact that appellant, though a witness, made no attempt to explain his whereabouts—all these facts tend to corroborate the eyewitnesses.

■ III. Appellant assigns error in the giving of the State's Instruction No. 2, which read as follows:

"All persons are equally guilty who act together with a common intent in the commission of a crime, and a crime so committed by two or more persons acting jointly is the act of all and each one so acting."

He complains that the instruction: assumes a crime had been committed, and that he had entered into a conspiracy; that it is a mere abstract declaration of law; that it authorizes a verdict of guilty if appellant was present at the massacre for any purpose at all; that it fails to define a conspiracy; that it authorizes a conviction for a criminal intent only, unaccompanied by any criminal act; that it directs a verdict but does not authorize an acquittal on any ground; that it fails to follow the indictment, and is at variance with Instruction No. 4 which directed a verdict of guilty if appellant "either alone or knowingly acting in concert with another or others" shot and killed the deceased; that it is too broad and general in its scope, and is not limited by any other instructions in the case; that it is especially vicious and confusing because the evidence showed three crimes, the kidnaping of Killingsworth and Griffith, the massacre, and the felonious assault upon Chief Fultz in Ohio.

A mere reading of the instruction will show that many of these extravagant charges are unfounded. It is true the instruction mere-

ly declares an abstract principle of law, but, as sufficiently appears from what is stated in the preceding paragraph, the State's Instruction No. 4 applied that principle concretely to the facts. Furthermore, by Instruction No. 9 the jury were informed that the appellant stood charged with the murder of Hermanson, and that they were not to consider any other crime or crimes mentioned in the evidence, with which the appellant may have been connected. The cases referred to in appellant's brief are State v. Williams, 309 Mo. 155, 180, 274 S. W. 427, 434; State v. Nasello, 325 Mo. 442, 459, 30 S. W. (2d) 132, 137; State v. Gentry, 329 Mo. 282, 288, 44 S. W. (2d) 27, 29; State v. Lindsey, 333 Mo. 139, 147, 62 S. W. (2d) 420, 424.

All these decisions refute appellant's contention instead of supporting it. Indeed he recognizes that fact, and in effect asks us to overrule them on the theory that it is error to give an instruction declaring an abstract proposition of law in a civil case and the rule ought to be the same in criminal cases. We shall not enter into a discussion of the collateral question as to what the law on this point is in civil actions, other than to say we find nothing in it which would convict the trial court of error in this case. [Corbett v. Terminal Railroad Assn., 336 Mo. 972, 977, 82 S. W. (2d) 97, 100 (1); State ex rel. Berberich v. Haid, 333 Mo. 1224, 1230, 64 S. W. (2d) 667, 669 (10); Leimnkuehler v. Wessendorf, 323 Mo. 64, 99, 18 S. W. (2d) 445, 453 (16); Kleinlein v. Foskin, 321 Mo. 887, 900, 13 S. W. (2d) 648, 654 (5).]

IV. Finally error is assigned on the prosecuting attorneys' conduct during the course of the trial and their argument to the jury. Appellant points out that they persisted in asking leading questions. They did, and were admonished by the court many times. It is to be regretted that in cases of such notoriety as this, having their origin in acts of brutal and unrestrained violence against human life, the prosecuting officers will permit themselves to be goaded by public indignation into a reckless course which jeopardizes the result of the trial. But it can also be said that appellant's counsel were by no means self-effacing.

To illustrate how the trial was conducted for the defense these incidents may be referred to. In the cross-examination of Sheriff Killingsworth the defense insisted on proving the *good reputation* of appellant's *brother* Joe Richetti (neither a party nor witness) who worked in the garage at Bolivar from which Killingsworth was kidnaped. Later in the same cross-examination when one of the prosecutors, for the purpose of making an objection, attempted to interrupt while counsel for appellant was asking a prejudicial question the latter cut in: "I can shout louder than that and I am not afraid, either." Another time, after the prosecutor with the express con-

sent of appellant's counsel had handed to the jury a photograph of the bullet riddled officer's car with a corpse lying by it, at the conclusion of the direct examination of a witness, he paused or stopped whereupon appellant's counsel objected: "Defendant objects to the tactics of the Prosecuting Attorney in stalling for time so that the jury may sit right after this testimony without cross-examination and look at pictures, particularly this picture which portrays a dead man lying at the car. It is prejudicial."

One specific complaint made by appellant refers to the following incident. During the cross-examination of Chief of Police Fultz of Wellsville, Ohio, the witness had testified that appellant threw his pistol on the ground and thereafter was arrested and taken to jail, following which the witness returned to the spot and picked up the pistol. Appellant's counsel was pressing the witness as to how he knew the pistol he found was the same one the appellant had thrown down there nearly an hour before, when the prosecuting attorney interrupted with the exclamation "it don't rain guns around there." Appellant's counsel objected to the remark and asked that the jury be discharged, but were overruled and saved exceptions. Then the court said: "I will ask the jury to disregard the statement made by the Prosecutor." Counsel for appellant then requested that the prosecutor be admonished, and the court said: "I will ask him not to lead the witness any more." Thereupon appellant's counsel excepted to the court's refusal to rebuke the prosecuting attorney and to discharge the jury. It is insisted here that this improper remark of State's counsel was of such a prejudicial nature that its baneful effect could not be cured by the court's ruling. We do not think so.

The other misprision assigned was this. While the jury panel was being qualified a member asked to be excused because it was necessary for him to take insulin for diabetes every morning and evening. Otherwise he was all right. Appellant's counsel twice announced "We have no objection." The assistant prosecutor said: "Well, the State would like to have Mr. ————— on the jury. I don't see what that would mean." Thereupon appellant's counsel insisted that the venireman be excused because the foregoing conversation had occurred in his hearing, but the request was denied. Appellant's brief alleges he was compelled to use one of his peremptory challenges in striking the venireman from the list because of the statement made by the assistant prosecuting attorney. The motion for new trial does not so allege, nor does the record show it so far as we have found. But the record does show that appellant failed to ask the venireman a single question concerning whether he was prejudiced by what he had heard. After having twice volunteered the statement in the hearing of the prospective juror that the defense made no objection to his excusal, appellant asks that it be

*assumed* the venireman was prejudiced by the declaration of the prosecutor—a statement the latter was almost compelled to make, if he wanted the man to remain on the panel, in view of what appel-·lant's counsel had openly said. We see no error in the trial court's ruling.

Still another complaint is that the prosecutor refused to let ap-pellant's counsel examine certain written statements of the witness-es Mrs. West, Sheriff Killingsworth and Walter Griffith, taken before the trial. This point was ruled adversely to appellant's contention in State ex rel. Page v. Terte, 324 Mo. 925, 25 S. W. (2d) 459.

Regarding the argument to the jury. The prosecutor said: "Where do we find him (appellant) afterwards? Back in Ohio. And with whom did we find him? Charles 'Pretty Boy' Floyd. . . . Would he kill? What was he going to do to that Chief of Police back there?" Thereupon counsel for appellant interrupted: "The defendant objects to any reference to his going to shoot any-one in Ohio as not being charged in this case; for the purpose of in-flaming the jury, alone." The court ruled: "Objection sustained; jury instructed to disregard any shooting in Ohio." That ended the incident. The appellant did not ask for a reprimand, or that the jury be discharged. In addition to that, as we have already stated, the court had given an Instruction, No. 9, that the jury were not to consider any crime or crimes mentioned in the evidence other than the killing of Hermanson. And the appellant did not ask an instruction limiting the effect of the evidence. There was no reversible error here. The facts are unlike those in State v. Jackson, 336 Mo. 1069, 1079-80, 83 S. W. (2d) 87, 93 (9), cited by appellant, where the defendant's objection to the argument was overruled and State's counsel continued unrestrained.

Again, the assistant prosecutor in his closing argument said: "the crowd had been gotten together, gentlemen, to come into the city where you live"—to liberate Nash. Appellant objected that counsel was misquoting the evidence. The court ruled: "the jury are instructed to disregard the remark about the crowd had been gotten together." Appellant made no further objections or requests, and saved no exceptions. The prosecutor continued, explaining to the jury that he was not attempting to quote the evidence, but was simply arguing deductively that during the hour and a half, nearly, between the time when appellant and Floyd arrived in Kansas City from their kidnaping trip, and the time when Verne Miller telephoned Mrs. Nash that she would see her husband again, they (appellant and Floyd) had been in communication with Miller and joined the conspiracy. There was no error against appellant in the court's ruling, and none in the argument, we think.

█ This disposes of all the points discussed in appellant's brief except a general contention that the judgment ought to be reversed and the cause remanded because of the prejudice against the defendant, even though the proceedings below were regular, citing cases such as State v. Webb, 254 Mo. 414, 434, 162 S. W. 622, 628 (4). Appellant's counsel say it was almost impossible for him to get a fair trial in Kansas City because of the enormity of the crime; the fact that he was linked with "Pretty Boy" Floyd, known to the whole country as Public Enemy No. 1; the fact that this admitted kidnaping of Killingsworth and Griffith and his felonious assault upon Chief of Police Fultz in Ohio figure so prominently in the case; and the fact that the Union Station Massacre was widely heralded as the acme of the crime and the G-Men were extolled as public heroes. The trial did not begin until June 10, 1935, almost exactly two years after the massacre; there was plenty of cooling time. While every defendant is entitled to a fair trial no man can expect the law to do the impossible and shield him altogether from the consequences of his own criminal notoriety and inhumanity.

█ We find no prejudicial error in the record. The conviction and infliction of capital punishment are affirmed. But, since the judgment provides for the execution of the death sentence by hanging within the walls of the county jail of Jackson County, pursuant to Sections 3722 and 3723, Revised Statutes 1929 (Mo. Stat. Ann., p. 3268); and inasmuch as these sections have since been repealed by Laws 1937, pages 222, 223, effective September 6, 1937, requiring the punishment of death to be inflicted by the administration of lethal gas, at the State Penitentiary in Jefferson City, Missouri; it is ordered that the cause be remanded to the trial court with directions to have the appellant brought before it and to pronounce sentence in accordance with the statutes last aforesaid, and the holding of this court in State v. Brown, 342 Mo. 53, 112 S. W. (2d) 568, 569.

All concur.